**NYHUIS, Plaintiff-Appellant, v. PIERCE, a. k. a. NYHUIS, nee SAMPSELL, Defendant-Appellee.**

Ohio Appeals, Eighth District, Cuyahoga County.

No. 22372.   Decided April 21, 1952.

William K. Gardner, Harold O. Ziegler, Cleveland, for plaintiff-appellant.
Edward L. Goette, for defendant-appellee.
Allen N. Corlett, Cleveland, for Amicus Curiae.

**OPINION**

By SKEEL, PJ.:

This appeal comes to this court on questions of law and fact seeking a decree of annulment of an alleged marital relationship between the parties resulting from a ceremonial marriage. The grounds on which the plaintiff bases his case are that at the time of the ceremonial marriage between the plaintiff and the defendant, the defendant was the common law wife of Harry A. Kohler. The defendant's answer joins in seeking the relief prayed for by the plaintiff.

The evidence given in support of the allegations of the petition is not in conflict. The trial of the case was assisted by Allen N. Corlett, Amicus Curiae, who represents the guardian of the estate of Beatrice Fernandez, incompetent, the interests of said incompetent being in conflict with those of this plaintiff in a probate proceeding now pending in the Probate Court of Cuyahoga County.

The defendant, who was then known as Willda R. Sampsell, met Harry A. Koehler at Luna Park in June or July of 1918. They were employees of the park, the employment of Kohler preceding that of the defendant. The defendant testified that in June of 1918 she had no place to go and that things were "kind of bad" for her, that Harry asked her, "How would you like to get married?" and she said, "I would be certaintly happy to have a home of my own." He said, "All right we will go down and get married tomorrow." Harry A. Kohler and Willda R. Sampsell on August 2, 1918 procured a marriage license from the Probate Judge of Cuyahoga County, the application being signed by both parties as appears by the record. The record then discloses that the defendant testified that Harry A. Kohler said after the license had been issued:

"Now we are tied up for good."

By the Court: "Did you assume you were married to him?"
A. "I did."

They then went to Luna Park where, in the presence of other employees of the park Kohler said, "I want you folks to meet my wife. We were just married this morning." There was a wedding supper that evening and the parties thereafter cohabited as man and wife. The uncontradicted evidence in the record also shows that they were known as Mr. and Mrs. Kohler in the neighborhoods in which they thereafter lived.

In explanation of her subsequent conduct, there came a time when she (the defendant herein—then known as Mrs. Willda R. Kohler) entertained a doubt as to her marital status with Harry A. Kohler. In answer to a question as to whether or not she ever requested Harry A. Kohler to have a minister

solemnize their relationship, she answered, "I did after a friend of mine had told me 'You must go to a minister'." There is no doubt but that after the license was procured and they both publicly declared themselves to have been married that following such declaration of marriage and by cohabitation and holding themselves out in the community as husband and wife, the defendant believed she was the lawful wife of Harry A. Kohler. It is also true that the neglect to carry out the request of Willda Sampsell (Kohler) to go through a ceremonial marriage, by Harry A. Kohler, was only because he did not think such procedure necessary. His answer to her request for a ceremonial marriage was said by her to be:

"He said we could not be tied any tighter if a minister had done it. However, I told him I was told by a friend of mine that we should be married by a justice of the peace or a minister. He said that we couldn't be tied any tighter if we had been married by a minister or a justice of the peace."

This answer conclusively shows he believed they were then husband and wife.

If the relationship of husband and wife at common law is once fully established, subsequent doubt thereafter by either party can have no legal effect.

The record discloses that after the defendant had talked to a friend about the necessity of a ceremonial marriage and Kohler put off her request to go to a minister, he (Kohler) introduced her to the plaintiff herein and suggested to her that Nyhuis was a good honest man and would make a good home for her. This was followed by the procuring of a marriage license by Nyhuis and Willda R. Sampsell, followed by a ceremonial marriage before a justice of the peace on May 8, 1919. Before this ceremony took place, the license procured August 2, 1918 was returned to the Probate Court. As to what took place after the ceremony, the defendant testified as follows:

"When we went home, Mr. Nyhuis was a bartender and he worked evenings, he went to work in the afternoon and when he came home and went to bed he said, 'You sleep on the davenport, the bed is mine.' Then on Saturday evening a lady came to the home and she became familiar with Mr. Nyhuis. I said, 'He is my husband. If you feel that way I won't live in the same house, I want a home,' and I left the house that day and I never saw the man until Mr. Goette pointed him out in the court room. I wouldn't have known the man and that's the truth, Judge."

The evidence is in agreement that Christian O. Nyhuis and Willda R. Sampsell never cohabited as man and wife. Shortly

thereafter, she returned to Harry A. Kohler, lived with him as husband and wife and a child was born; the record of vital statistics of the City of Cleveland shows the registering of such child as "legitimate" and their relationship continued until Kohler abandoned his wife and child and left for parts unknown about 1922.

Thereafter, Willda R. Kohler (Sampsell) on December 23, 1925, married Frank P. Pierce with whom she is now living and has since the date of their ceremonial marriage. The record also shows that Kohler is dead, the date of his death being in doubt, probably some time before 1932.

The plaintiff after all of the foregoing proceedings, by ceremonial marriage on April 4, 1926, married Estelle Chavis at Erie, Pennsylvania, with whom he lived as husband and wife until her death in 1947.

As clearly established by the evidence, there can be no doubt but that a common law marriage was established between Willda R. Sampsell and Harry A. Kohler on August 2, 1918. The evidence shows that there was an agreement, in praesenti, to become husband and wife followed immediately by cohabitation as husband and wife and the holding of themselves out publicly as sustaining that relationship and that they were so regarded in the community.

**Umbenhower v. Labus, 85 Oh St 238**, 97 N. E. 832; **Markley v. Hudson, 143 Oh St 163**, 54 N. E. (2) 304; **Dibble v. Dibble, Admr., 88 Oh Ap 490**, 100 N. E. (2) 451.

We have therefore only to consider first, whether, because of the fact that the plaintiff was a willing party in creating the relationship which he now seeks to annul, is entitled to the assistance of equity and second, whether annulment is the proper remedy.

The first question has been decided in the affirmative in the well-considered case of **Smith v. Smith, 72 Oh Ap 203**. Motion to certify was overruled by the Supreme Court January 20, 1943.

In the Smith case the action was to annul a ceremonial marriage performed after the woman (defendant in the action) had been granted a divorce in Mexico, the court there acting without obtaining jurisdiction of the parties. The court held:

"(3) When a marriage ceremony is performed that is void because one of the parties is married to another at the time, either party may maintain an action for a decree declaring such ceremony a nullity.

"(4) As the state has an interest in having the marital status of persons determined, the right to maintain an action to have a void ceremony decreed to be a nullity cannot be de-

feated by the conduct of the parties. The doctrines of estoppel, **in pari delicto** and clean hands have no application to such an action to prevent the court from entering a decree declaring the nullity."

The undisputed facts here being considered present a far stronger case for the intervention of a proceeding in equity than was presented in the Smith case, supra. The parties in this action lived in the same house only three or four days after the ceremony and both deny that they ever cohabited as husband and wife. There are no claims advanced by either party against the other that would depend upon establishing marital relations between them such as claims for alimony, support or division of property. There is no direct evidence that Nyhuis was completely informed of the relations between Harry A. Kohler and Willda R. Sampsell. The public interest in having the legitimacy of the child of Harry A. Kohler and his common law wife, Willda, sustained as well as clearing her present marital status with Frank P. Pierce, is here presented as is also true of the marital status of the plaintiff and Estelle Chavis (Nyhuis) now deceased. The common law marriage of Harry A. Kohler and Willda R. Sampsell which is supported by clear and convincing proof makes the attempted ceremonial marriage of Nyhuis and Sampsell void ab initio. Such a holding clears for all time the muddy waters which otherwise engulf all those here involved.

In American Jurisprudence, Volume 53, at page 221, the third paragraph of Section 59, the author says:

"The general rule has been followed in cases where the public interest favors the annulment of a void marriage, that the doctrine of clean hands does not prevent one from coming into court and obtaining the annulment of a marriage. Such rule has been followed with respect to incestuous marriages, bigamous marriages, and marriages prohibited because within a certain time after a divorce of one of the parties."

And, at page 271, Section 148, the author says:

"It is within the legislative power to prohibit polygamy. A marriage, whether ceremonial or common-law, between persons one of whom is married to another, although he or she has been deserted by his or her spouse, is void, generally by express statutory provision, and not merely voidable. It may be treated so by the parties to it and by all the world, it is good for no legal purpose, it is not attended or followed by any of the incidents of a valid marriage; it gives rise to alimony; its invalidity may be asserted by anyone if the question becomes material; and no decree of its nullity is necessary although such a decree may be, and frequently is, obtained.

"The general rule is that a subsequent marriage does not in itself in any case dissolve a previous existing one. A marriage is not dissolved by the fact that the wife, relying on the validity of a church divorce, became a party to another marriage ceremony."

The statutory provision in Ohio prohibiting remarriage while a person has a husband or wife living is §8001-1 GC (former §11181 GC), and §12412 GC, provides the penalty for bigamy.

We must conclude therefore that a court of equity will entertain a suit for annulment under the circumstances here presented by the pleadings and evidence. Any other holding would be in conflict with the judgment in the Smith case, supra.

The remaining question is as to whether or not the action should be one for divorce rather than an annulment proceeding.

After this case was tried and decided in the Common Pleas Court, the Supreme Court rendered its decision in the case of **Eggleston v. Eggleston, 156 Oh St 422.** The syllabus is as follows:

"(1) **Sec. 11979 GC**, authorizing the granting of a divorce where 'either party had a husband or wife living at the time of the marriage from which the divorce is sought,' provides an exclusive remedy in cases involving that situation.

"(2) Where a decree of divorce is granted on the petition of a woman on the ground that the defendant had a wife living at the time of his marriage with the plaintiff, the court has jurisdiction to grant to the plaintiff alimony and other relief authorized by the statutes on divorce and alimony. (**VanValley v. VanValley, 19 Oh St, 588,** approved and followed.)"

The facts and judgment of the Eggleston case, supra, are quite different and are clearly distinguishable from the instant case. In the Eggleston case the plaintiff lived with the defendant as her husband for many years, by which relationship children were born and property acquired. The plaintiff prayed for divorce, alimony and other relief authorized by the divorce statutes. The defendant assumed he had been divorced from his then wife prior to the ceremonial marriage with the plaintiff. Both parties believed that the defendant was free to assume a new marital status, the finding of fact being that the defendant had obtained a divorce, but the service was fatally defective which "fact was not known to either of the parties herein until recently." Sec. 11979 GC (now §8003-1 GC) provided as one of the grounds for divorce:

"That either party had a husband or wife living at the time of the marriage from which the divorce is sought."

The plaintiff in the Eggleston case was asking for relief under the divorce statute and was clearly entitled thereto. The Supreme Court said on pages 427 and 428:

"The effect of that holding is that, under the provisions of the statute authorizing a divorce on the ground that either party had at the time of the marriage a husband or wife living, there is granted the right to the relief provided in the supplemental statutory provisions. In the annulment of the marriage contract the court instead of considering the plaintiff's case for divorce under the statutory provisions authorizing the same deprives the plaintiff of any consideration of her claim for alimony to which she may be found to be entitled under the statute. The General Assembly specified certain grounds upon which a decree of divorce may be predicated, among them the particular ground involved in this case It is to be observed that 'fraudulent contract' is another ground specified as a ground for divorce, and that also goes to the validity of the marriage.

"It is our view, therefore, that §11979 GC, authorizing the granting of a divorce where 'either party had a husband or wife living at the time of the marriage from which the divorce is sought,' provides an exclusive remedy in cases involving that situation, and that in such proceeding the court is authorized to adjudicate the issue of relief incident to the granting of a divorce."

Under the facts of the instant case, neither of the parties asked for nor are they entitled to any relief that is exclusively within the purview of the divorce statutes. They both seek only to have a court of equity decree that no lawful marital status was created by the attempted marriage of May 8, 1919. The law of this state has always held attempted marriages by parties already in lawful wedlock as absolutely void. See §8001-1 GC (former §11181 GC). And, where the facts do not require the use of the divorce statutes to protect rights of property or support, they should not be construed as being therein involved.

We hold, therefore, that under the facts in this case the action in annulment can be maintained.

For the foregoing reasons, decree is entered for the plaintiff. Exceptions noted. O. S. J.

HURD, J, THOMPSON, J, concur.