In re Estate of Soeder.   (Two cases.)

[Cite as In re Estate of Soeder, 7 Ohio App. 2d 271.]

(Nos. 27581 and 27584—Decided September 22, 1966.)

*Mr. Vincent C. Fornes* and *Messrs. Baker, Hostetler & Patterson,* for appellant Theresia Soeder Towns, Executrix.

*Mr. Richard F. Patton,* for appellant Isabella Soeder Ohlman.

*Messrs. Rippner, Schwartz & Carlin, Mr. Ellis V. Rippner, Mrs. Angela G. Carlin, Mr. Daniel R. McCarthy* and *Mr. Maxwell J. Gruber,* for appellee Catherine M. O'Connell, Exceptor.

CORRIGAN, J. Appeal is presented to this court on questions of law from a judgment rendered by the Probate Court of Cuyahoga County on July 16, 1965, finding that certain exceptions to an inventory and appraisal, filed on behalf of one Catherine M. O'Connell in connection with the probate of the estate of Edward A. Soeder, were well taken; and finding further that the exceptor, Catherine O'Connell, be granted her rights in such estate as surviving spouse, namely, a year's allowance as provided by Section 2117.20, Revised Code, and property exempt from administration as provided by Section 2115.13, Revised Code.

Parallel appeals were filed by Theresia Soeder Towns, executrix of the estate of Edward A. Soeder, being No. 27581 on the docket of this court, and by Isabella S. Ohlman, a beneficiary under the will of Edward A. Soeder, No. 27584 on our docket. Both these ladies are sisters of the decedent. The appeals were argued together, and we will pass on the respective assignments of error in one opinion.

The decedent, Edward A. Soeder, died testate on February 29, 1964. Decedent's will was admitted to probate on March 24, 1964, and his two sisters were named to share the bulk of the estate. The will was executed on July 23, 1963, and made no mention of a surviving spouse.

On August 3, 1964, the executrix filed the inventory and appraisal. On September 11, 1964, one Catherine M. O'Connell filed her exceptions to the inventory and appraisal, claiming that she was the surviving spouse and sole heir at law of the decedent. Later, on November 12, 1964, Catherine M. O'Connell filed supplemental exceptions to the inventory and appraisal demanding her lawful rights as a surviving spouse. Following an extended hearing on the exceptions, the Probate Court ruled on July 16, 1965, that the exceptor, Catherine M. O'Connell, was the common-law wife of the decedent.

The following errors are assigned in appeal No. 27581:

1. Error in assuming jurisdiction of the subject matter and/or the parties.

2. Error in finding that the exceptor established by clear and convincing evidence that she was competent to marry.

3. Error in finding that the exceptor established by clear and convincing evidence a mutual agreement *in praesenti* between exceptor and the decedent, Edward A. Soeder.

4. Error in finding that a common-law marriage was established by exceptor.

5. Error in not allowing Isabella Soeder Ohlman to remain in the courtroom during the entire course of the trial.

6. Error in not permitting the introduction of estate's exhibits 67 and 68.

7. Error in not permitting the testimony of Father Casper Heimann, Father Victor Ranly and Monsignor Kirby.

8. Error in excusing Father Butler.

9. Error in allowing the introduction of exceptor's exhibits A, D, F, I, R, S (all photographs), and TTT and VVV (letters).

10. Error in its rulings on the reading of the deposition of John O. Dissinger, exceptor's rebuttal witness.

11. Error in that the finding in favor of the exceptor is contrary to law, and the court below should have found in favor of the estate.

12. Error in that the finding of the court below is manifestly against the weight of the evidence.

Assignments of error in appeal No. 27584 are:

1. Exceptor failed to prove competency to marry.

2. The Probate Court erred in finding that only one element was necessary to prove a common-law marriage.

3. Error claimed as to words *in presenti* being proved by, clear and convincing evidence.

4. Barring the courtroom to an heir under the will and at law was error.

The record reflects certain facts which are deserving of mention here in order that there may be an understanding of the relationship of the decedent and the exceptor. Edward A. Soeder was seventy-four years old at his death and had resided at 1635 East 38th Street, Cleveland. He was in the dairy products business, and his estate totalled approximately a half million dollars.

As the court below found in its opinion, "Edward A. Soeder did not hold himself out to be married. The records at the hospital divulge his statement that he was single, as did his income tax records, will and other documents. In fact, he made statements that he never was going to be married."

Thirty of the forty-six witnesses called by the estate to testify were friends, neighbors and close business associates of the decedent, including women he dated and one woman with

whom he kept steady company the last nine months of his life. These witnesses were of the opinion that he was single.

All of the decedent's written records introduced as exhibits show him to be single, viz, his United States income tax returns, his hospital records, his Christmas cards, and his wills. The Cleveland Directory records from 1956 through 1964 indicate the decedent lived on East 38th Street, unmarried.

The exceptor, Catherine M. O'Connell, was married by a priest to one Joe Hudak. She later divorced Mr. Hudak and then remarried him. Later, a second divorce resulted. She met the decedent in 1938. After her second divorce she kept company with the decedent for a long period. This liaison seemed to be on a very intimate basis, and some witnesses testified that in their opinion the exceptor and the decedent were married.

In May 1956, the exceptor filed a suit against decedent for breach of promise. That suit was settled about a month afterward, and on that day the decedent and the exceptor visited the home of Margaret McCullough, a sister of the exceptor, at 1286 West 105th Street. On the occasion of that visit, according to the testimony of a friend, Veronica Saley, who was present with Mrs. McCullough, the couple "exchanged marriage vows," as stated in the opinion of the court below.

It appears from the record also that Catherine O'Connell and Edward A. Soeder went to Florida together in 1959 and 1961 and registered in separate rooms; that Catherine O'Connell sent a Christmas card each year to Edward A. Soeder at his East 38th Street address; that Catherine O'Connell maintained a residence in the southwest part of Cleveland all her life; that Catherine O'Connell was a juror in a case in Common Pleas Court in 1959 and testified on the *voir dire* in that lawsuit that she was a divorced woman; that the exceptor signed the visitor's register at the wake of Edward A. Soeder as Catherine M. O'Connell; and that Catherine O'Connell's written records introduced as exhibits show her to be unmarried, namely, a warranty deed, a mortgage deed, pay checks, employment records, voting record, automobile title, jury commission record, and quit-claim deed.

The first assignment of error to be considered is in appeal No. 27581. It specifies that:

"The Probate Court below erred in assuming jurisdiction of the subject matter and/or the parties."

The problem arises in this fashion. The executrix filed an inventory and appraisal in Probate Court. Catherine M. O'Connell filed exceptions to the inventory and appraisal in which she alleged that the appraisers had failed to provide for her as the surviving spouse of the deceased and that no year's allowance or exempt property had been set aside for her. This claim is predicated upon the basis that she was the common-law wife of the decedent. Appellant's attack poses the following question:

Does the Probate Court possess the jurisdiction to determine the issue of the common-law marriage of the exceptor with the decedent as an incident of a hearing on exceptions to the inventory?

Section 2101.24, Revised Code, sets forth jurisdiction of the Probate Court as itemized in subparagraphs "A" through "O." These subparagraphs are not pertinent to the issue involved here. The same section, following the recitation of the above subparagraphs, contains the following provision:

"The Probate Court shall have plenary power at law and in equity fully to dispose of any matter properly before the court, unless the power is expressly otherwise limited or denied by statute."

The foundation for the argument is that the determination of the matter pursuant to Section 2123.01 et seq., Revised Code, and specifically Section 2123.07, Revised Code, relieves the fiduciary of the responsibility of distribution upon such determination, while under the "exceptions" statute (Section 2109.58, Revised Code) there is no such provision.

In support of her argument, the appellant points out that under the "exceptions" statute there is no provision for service of notice upon "unknown heirs of the decedent," as Section 2123.04, Revised Code, does in the part dealing with determination of heirship. The decedent died at the age of seventy-four, and from the record it is indicated that he had many girl friends. The appellant argues that any one of such women might possibly be an alleged common-law wife of the decedent and might attempt to prove such claim against the estate, thus leaving the estate open to further claims that might be institut-

ed under the provisions of Section 2123.06, Revised Code. It is her further contention that the purpose of Section 2123.01 *et seq.*, Revised Code, as devised by the Legislature, was to get all parties who might have a claim before the court in one proceeding, and to eliminate the problem of determining heirship piecemeal. It is pointed out that Section 2109.58, Revised Code, provides:

"* * *

"* * * exceptions to the inventory * * * may be filed at any time within six months * * * by *any person* interested in the trust or in any of the property included in the inventory., * * *." (Emphasis added.)

The other sections relied on are as follows:

Section 2123.01, Revised Code:

"Whenever property passes by the laws of intestate succession, or under a will to a beneficiary not named in such will, proceedings may be had in the Probate Court to determine the persons entitled to such property."

Section 2123.02, Revised Code:

"In a situation described in Section 2123.01 of the Revised Code, the executor or administrator may file in the Probate Court of the county where the estate is being administered a petition signed by such executor or administrator or his attorney, which petition shall be verified. The surviving spouse and the legatees and devisees, or the heirs and distributees of the decedent, including those whose names are unknown, shall be made parties defendant. The petition shall contain a concise statement of the pertinent facts and shall conclude with a prayer for the determination of the heirs and distributees of such decedent or of the devisees or legatees not named in the will and their respective interests in the estate."

Section 2123.06, Revised Code:

"Whenever it is necessary for any person other than an executor or administrator to determine who are or were the heirs at law of a deceased person, on the petition of any interested party and proceedings like those set forth in Sections 2123.01 to 2123.05, inclusive, of the Revised Code, the Probate Court may make a determination thereof."

There is no dispute that the Probate Court has jurisdiction.

in both the disposition of exceptions to an inventory filed by a fiduciary and in an action to determine heirs. The question, as we perceive it, is whether the Probate Court may, in the exercise of its jurisdiction to hear exceptions to an inventory, hear and determine the existence of a common-law marriage. It is fundamental in the administration of estates that statutory year's-allowance and exempted-estate provisions in favor of a widow of a decedent must be determined. The widow may be such by virtue of a statutory ceremonial marriage or a common-law marriage. Whether such marriage exists, whichever it may be, must be ascertained as an incident of the determination of the propriety of the inventory.

The courts of this state have upheld the authority of the Probate Court to construe the terms and legal effect of both postnuptial and prenuptial contracts as an incident of the hearing on exceptions to an inventory. 22 Ohio Jurisprudence 2d 465, Executors and Administrators, Section 114; In re Estate of Thrush, 76 Ohio App. 411; In re Estate of Shafer, 77 Ohio App. 105; In re Estate of Crabtree, 30 Ohio Law Abs. 176.

This court, on December 6, 1965, in an unreported case, No. 27546, In re Estate of Fogarascher, affirmed the judgment of the Probate Court in which the Probate Court determined the issue of a common-law marriage as an incident of its hearing upon exceptions to an inventory. A motion to certify was overruled by the Supreme Court on March 9, 1966 (No. 39939).

As to the complaint that the Probate Court should have proceeded under the "Determination of Heirship" statutes, it should be pointed out that such action may be instituted by the executor or administrator if such determination is necessary under Section 2123.02, Revised Code. This was not done by the fiduciary.

It is likewise the fact that "any person other than an executor or administrator" may bring such action "whenever it is necessary" pursuant to Section 2123.06, Revised Code. The exceptor, however, chose to file her exceptions to the inventory, as was her right. Moreover, she could have waited and attacked the account and order of distribution at a later time. From the standpoint that estates of deceased persons should be administered as expeditiously as possible, it must be said that the

election to file exceptions rather than other proceedings was salutary. *Stofft* v. *O'Shaughnessy, Admr.*, 62 Ohio Law Abs. 595.

We hold this claim of error to be without merit.

Assignment of error No. 2 is as follows:

"The Probate Court below erred in finding that the exceptor established by clear and convincing evidence that she was competent to marry."

Appellant argues that the record indicates that exceptor was married by a priest to one Joe Hudak and that exceptor divorced him and subsequently remarried him; that no journal entry or entries of divorce were produced; and that no evidence of any kind was submitted to show the dissolution of such marriages to Joe Hudak.

Where there is a showing of a prior marriage, there is a presumption of the continuation of that status, and the burden of proof is on the exceptor to overcome such presumption. *McHenry* v. *McHenry*, 19 Ohio App. 187.

The burden of proof is upon the exceptor to prove a common-law marriage by clear and convincing evidence; and this burden would extend to the issue of competency to enter into such marriage.

No question as to the capacity of the exceptor to marry was raised during the course of the hearing.

Witness Catherine Sands, on cross-examination, testified that sometime around 1932 the exceptor was married to one Joe Hudak, lived with him and then she was divorced from him; and that exceptor married him again. She was asked whether exceptor lived with Mr. Hudak in 1954. She answered, "I don't think so.

"Q. Well, do you know or don't you? A. I don't believe she did. Oh, no, not in—no, I think she was divorced from Joe a long time before that, the second time.

"Q. But you don't know for sure, is that right? A. No."

Witness Leo D. O'Connell, a brother of exceptor, testified on cross-examination that his sister, the exceptor, married one Hudacek in the early 30's; and that Hudacek changed his name to Hudak.

"Q. Did he later change his name to Hudak? A. I believe he did.

"Q. Do you know when that was? A. I would have no idea. It was after they were divorced.

"Q. How long did your sister [*sic*] [live] with this Hudak, Hudd, or Hudacek? A. A couple of years or so, up until the time that she divorced him.

"* * *

"Q. Now, also during the 30's did she live at 3402 Ruby Avenue? A. After she divorced Joe, she lived with my mother and my brother and my stepfather and I."

It was on the strength of the foregoing testimony that the trial judge determined that exceptor was divorced. This testimony was elicited on the cross-examination of counsel for the estate. There was no objection by counsel to the testimony of witness Catherine Sands. There was an objection to the testimony of Leo Daniel O'Connell as to his statement, "up until the time that she divorced him." Counsel for the estate moved that this testimony be stricken. His motion was denied.

We find no error in the Probate Court's ruling and conclusion of competency to marry in the face of the testimony quoted above.

Assignment of error No. 3 urges that:

"The Probate Court below erred in finding that the exceptor established by clear and convincing evidence a mutual agreement in praesenti between exceptor and the decedent, Edward A. Soeder."

Veronica Saley, a friend of the family, testified on direct examination:

"A. I came home from work with Mrs. McCullough. She asked me to come over to supper, which I did occasionally when I had nothing else to do. When we were having supper that night, the doorbell rang, and Margaret went to answer it. I stayed in the kitchen having coffee. She opened the door and I heard her say, 'Oh, my goodness, not again.'

"I couldn't imagine who she was referring to. Then I could see—I mean I heard Ed and Catherine speaking. I recognized Catherine's voice. She asked them to come into the kitchen as we were having supper. She asked them if they wanted to have something to eat, or have a cup of coffee.

"When I saw it was Ed and Catherine coming in, I was kind of shocked because I didn't expect to see the two of them

together in view of the trouble that they had before. And I said something to this extent, 'What? Not again.'

"And so Ed said to me that he had thought things over, and that he was going to do better from then on. He said that he just couldn't stay away from Catherine in view of the fact that they had been going together for such a long time and she had meant a lot to him.

"So they sat down, and I finished my coffee. He said to Margaret that he had something that he wanted to tell her. So they went into the living room. He said, 'You come along, too, Ronnie.'

"So I came into the living room with them, and he said that they wanted to make this a legal affair again, that they wanted to be married. They wanted to have a—I guess you call it a common-law marriage, or whatever it is. They wanted to get married in front of witnesses again.

"They asked us whether we would witness this marriage ceremony. So then I was surprised. Then Ed said, 'I take this woman Catherine O'Connell for my wedded wife.'

"Catherine said the same to him, 'I take this man for my lawful wedded husband'; upon which they kissed each other, and we went into the kitchen and finished our coffee. * * *"

The record indicates that Mrs. McCullough is exceptor's older sister.

From the foregoing testimony of witness Saley, it is apparent that while in the kitchen of Margaret McCullough's home Edward Soeder "said to Margaret that he had something that he wanted to tell her. So they went into the living room. He said, 'You come along, too, Ronnie' "(meaning witness).

Margaret McCullough, although present in the courtroom for the hearing, was not called as a witness to testify as to the incident described by witness Saley. She later testified as a rebuttal witness for exceptor, but again, no attempt was made to elicit testimony to corroborate the witness Saley.

Appellant points out that the conclusion is justified that, since Mrs. McCullough was available and did not testify, she would have testified unfavorably. She likewise points out that witness Saley's testimony, particularly her statements involving the word "again," is confusing and uncertain rather than clear and convincing.

The appellee, on the other hand, argues with propriety that nowhere in the record is there any evidence presented to overcome the testimony of witness Saley; and that it is of great importance to note that counsel for the appellant did not cross-examine or in any way impeach the veracity of the witness or her testimony as to the contract. We find in 21 Ohio Jurisprudence 2d 711, Evidence, Section 685, the following:

"When a disinterested witness, who is in no way discredited, testifies to a fact within his own knowledge which is not in itself improbable, or in conflict with other evidence, he is to be believed, and the facts to which he testifies are to be taken as legally established. * * *"

In the case of *In re Estate of Woods,* 110 Ohio App. 277, it is said, at page 281:

"* * * As a general rule, a reviewing court cannot assume that any witness attempted to deceive the trial court. On the contrary, the presumption is that every witness under oath is honest. * * *"

We find no merit to this claim of error by appellant.

Assignment of error No. 4 is as follows:

"The Probate Court below erred in finding that a common-law marriage was established by exceptor."

We note that the trial court in its opinion expressed the following:

"Reviewing the evidence, we have in the instant case a man and a woman occupying a meretricious relationship for some 20 years. Suddenly, the woman sues the man for his breach of promise to marry her. The lawsuit is dismissed by action of the woman and within minutes of the signing of the release by the woman, the man and woman exchange vows of matrimonial intent in front of two witnesses and resume their relationship of appearing to a few, but not to all, as man and wife, still maintaining their separate residences, still identifying themselves on various jobs, voting and government forms as not married.

"Does this then constitute a common-law marriage? We think that it does and it does because of the contract between the parties.

"* * *

"The decisions have established that marriage must be

founded upon a contract. The contract is here and established by clear and convincing evidence. That is all that is necessary to establish a marriage relationship. And further acts of the parties are not necessary to prove any marriage within this set of circumstances.

"It is the decision of this court:

"1. Cohabitation, the holding themselves out as husband and wife in the community in which they move, and a reputation as husband and wife in the community in which they live, by the deceased and the exceptor, were not established by clear and convincing evidence.

"2. A mutual agreement to marry *in praesenti* made by parties competent to marry by and between the deceased and the exceptor was established by clear and convincing evidence.

"3. A common-law marriage is established by the facts in this case.

"4. The exceptions filed herein to the inventory and appraisal are well taken and the file is hereby ordered to be corrected in accordance with this decision."

Although the decision of the court under paragraph one above specifically states that:

"(a) cohabitation,

"(b) holding themselves out as husband and wife in the community, and

"(c) a reputation as husband and wife, were not established by clear and convincing evidence,"

appellee argues in her brief that:

"Proof of cohabitation of appellee and decedent was established by the evidence;

"Proof that the parties held themselves out as husband and wife and were regarded as husband and wife in the community was established by the evidence;

"Appellee proved her common-law marriage in accordance with the law of Ohio."

The problem confronting us then is:

(1) Whether the proof by clear and convincing evidence of an agreement by *verba praesenti*, by persons competent to marry, is sufficient to establish a common-law marriage, or;

(2) is it necessary, in addition thereto, to prove (a) cohabi-

tation, (b) holding out, and (c) reputation as husband and wife; and,

(3) if the latter three elements must be proved, what degree of proof therefor will suffice for them?

In 35 Ohio Jurisprudence 2d 516, Marriage, Section 22, it is said:

"The elements essential to the establishment of a common-law marriage have become well established by court decision. They are the following: (1) a mutual agreement to marry in praesenti, made by parties competent to marry; (2) accompanied and followed by cohabitation as husband and wife; (3) a holding of themselves out as husband and wife in the community in which they move; and (4) being regarded as husband and wife in the community in which they move."

In a careful examination of the article by Professor Hugh A. Ross, entitled "The Ohio Law of Marriage," published in 14 Western Reserve Law Review 724, to which the trial court referred with unqualified commendation, we find some very interesting comments, dealing with the question before us. He makes this observation, commencing at page 731:

"There is one area where the Ohio law on common-law marriage is still in doubt. Are the elements of capacity and agreement the only essentials of a valid common-law marriage, or is performance of the agreement also required? A few states have held that performance of the agreement, *i. e.*, cohabitation as husband and wife, usually evidenced by reputation of the marriage in the community, is required before such a marriage becomes valid. *The great weight of authority is that cohabitation is not required.* * * *." (Emphasis supplied.)

He quotes from the case of *Hulett* v. *Carey, Admr.*, 66 Minn. 327, 69 N. W. 31, 61 Am. St. Rep. 419, 34 L. R. A. 384, as a typical statement of the majority rule. And another example of the majority rule is *Great Northern Ry. Co.* v. *Johnson*, 254 F. 683. Ross states as his conclusion that the two illustrations he has described are examples of what he claims to be the great weight of authority and the majority rule.

Ross does, at page 732, in his article, declare that, "In spite of occasional text statements to the contrary, this problem has never been adjudicated in any reported Ohio case." He speci-

fically refers to what has been cited as *Umbenhower* v. *Labus*, 85 Ohio St. 238, and *Markley* v. *Hudson*, 143 Ohio St. 163, in which, as dictum, cohabitation and reputation were held necessary; and further, he refers to *Leibrock* v. *Leibrock*, 63 Ohio Law Abs. 565, and *Gatterdam* v. *Gatterdam*, 86 Ohio App. 29. He comments about these cases that "the court concludes that the language of the *Umbenhower* and *Markley* cases lends strength to the theory that reputation and cohabitation are only evidential elements, and the *sine qua non* of common-law marriage is the agreement. In both of these cases the conclusions expressed were dicta as cohabitation was proved."

Ross continues as follows:

"Several conclusions can be drawn from the cases. First, it is agreed by all that a contract *in praesenti* is a requisite of common-law marriage. The agreement need not be expressly proved, but can be inferred from cohabitation and reputation. Second, the question of whether cohabitation and reputation are evidential elements only, or are vital prerequisites to the marriage, has not yet been decided in Ohio and could be decided either way.

"The issue will probably arise where the husband dies shortly after the agreement and the wife is claiming a widow's share. If there is no cohabitation proved, and the only evidence of the agreement is the testimony of the alleged wife, the court need not decide if cohabitation is necessary. It could rule against the marriage on the ground that the unsupported testimony of one party does not satisfy the requirement that the agreement must be proved by clear and convincing evidence. If the agreement is clearly proved, such as where it is written, as in the *Great Northern Railway case, supra*, or where there are independent witnesses to an oral ceremony, the court will have to face the issue. It is submitted that in such a case the court should follow the majority view and uphold the marriage. If the minority rule is followed, the next question is the quantum of proof of cohabitation and reputation necessary. This is difficult to determine, and a rule which requires only clear proof of the agreement is much easier to administer. Further, it is clear that no cohabitation is necessary for a valid statutory marriage. There is some utility in adopting a con-

sistent rule which applies to all marriages, as long as the statutory ceremony or the common-law contract can be clearly established. Finally, if the minority rule is adopted, it seems logically inconsistent to say that the relations between the parties do not ripen into marriage until an indefinite period of cohabitation and 'holding out' has occurred, and yet provide, as the Ohio law does, that such cohabitation is a criminal offense.''

In view of the reference of Professor Ross to the majority rule and the minority rule, where he cites two cases as demonstrative of the majority rule, and because it appears that the trial judge in his decision was influenced largely by the conclusions of the Professor, it behooves us to examine closely the two cases which he advances as demonstrative of the majority rule.

The first, *Hulett* v. *Carey, Admr.*, 66 Minn. 327, at page 336, 69 N. W. 31, 61 Am. St. Rep. 419, 34 L. R. A. 384, reads, in part: ''* * * We do not so understand the law.

''The law views marriage as being merely a civil contract, not differing from any other contract, except that it is not revocable or dissoluble at the will of the parties. The essence of the contract of marriage is the consent of the parties, as in the case of any other contract; and, whenever there is a present, perfect consent to be husband and wife, the contract of marriage is completed. The authorities are practically unanimous to this effect. Marriage is a civil contract jure gentium, to the validity of which the consent of parties able to contract is all that is required by natural or public law. If the contract is made per verba de praesenti, and remains without cohabitation, or if made per verba de futuro, and be followed by consummation, it amounts to a valid marriage, in the absence of any civil regulations to the contrary. 2 Kent. Comm. p. 87; 2 Greenl. Ev., Section 460; 1 Bish. Mar. & Div., Sections 218, 227-229. The maxim of the civil law was 'Consensus non concubitus facit matrimonium.' The whole law on the subject is that, to render competent parties husband and wife, they must and need only agree in the present tense to be such, no time being contemplated to elapse before the assumption of the status. If cohabitation follows, it adds nothing in law, although it may be evidence of marriage. It is mutual, present consent, lawfully expressed, which makes the marriage. 1 Bish. Mar., Div. & Sep., Sections

239, 313, 315, 317. See, also, the leading case of *Dalrymple* v. *Dalrymple*, 2 Hagg. Consist. 54, which is the foundation of much of the law on the subject."

In the opinion of *Great Northern Ry. Co.* v. *Johnson*, 254 F. 683, we find the following:

"* * * A careful examination of the above-cited Missouri cases, and of many others from that state, convinces that in that state the marriage contract possesses the elements of an ordinary contract and none others. That contract establishes a very important status, but the contract itself is in no respect peculiar. Mutual assent to the present institution of the status is all sufficient. No other act, such as cohabitation (*Davis* v. *Stouffer*, 132 Mo. App. 555, 112 S. W. 282), is necessary to complete the institution of the status where the mutual assent contemplates a marriage in praesenti. Why should the physical presence of the parties be essential to the legality of this contract, any more than of any other? * * *."

These two cases do not state the law in Ohio, and we are unable to agree with Professor Ross and the court below that there is doubt as to the law in Ohio on common-law marriage.

In view of the conclusion of the trial court on this most important question of common-law marriage in Ohio, in view of the trial court's opinion as reported in 4 Ohio Misc. 96, with its dependence on the Ross article therein, and in view of the trial court's observations about confusion in this area of the law in Ohio, it seems to us to be desirable to briefly review some of the history of marriage and so-called common-law marriage and the pertinent Ohio law on the latter subject.

The first recorded reference to legal marriage that our research has uncovered is that marriage was carefully regulated by a large portion of the law Code of Hammurabi. He was the ruler of the Kingdom of Babylon, 2125-2080 B. C. This is the earliest extant code of law. In the second year of his reign he began the reforms that culminated in the promulgation of the Code. He succeeded in transforming a chaotic mass of customs into something like an orderly system of law. Both dowries and bride prices were subjects of the Code. Only those women who had once been married or had been seduced were free to marry the men of their choice. The others were given in marriage by their fathers who might accept or reject the suitors.

Marriage was by contract; a marriage contract was drawn up, sealed and witnessed. The Babylonian could have but one legal wife, though concubinage was permissible and common. See, R. W. Harper, The Code of Hammurabi.

It has been asserted in many writings that the idea of the validity of a common-law marriage comes to us directly from the Canon Law, and through it from the Roman law. From all that has been written on the subject there are strong grounds for concluding that at least in the last twenty-four centuries, in countries with some civilization, marriage without any formality except the agreement of the parties has at times been tolerated but has never met with general approval. Formalities in connection with marriage did not always consist of ceremonies, and on occasion consisted of written contracts generally related to dowry rights. A dowry was thought to be necessary to be brought by the wife to the husband to mark the difference between a wife and a concubine. Smith, Dictionary of Greek and Roman Antiquities (3rd Ed.), Volume 1, page 692, and Volume 2, page 136. The word "dowry" is mentioned in Genesis, 34:12, "Ask me never so much dowry and gift and I will give * * *; but give me the damsel to wife."

In ancient Rome, marriages were attended by religious ceremonies performed under the auspices of the Pontiff. Preceding the ceremony, formal betrothal and dowry instruments were usual. See, Corbett, Roman Law of Marriage, page 1. Concubinage was hardly distinguishable outwardly from marriage by agreement of the parties. The evil of concubinage became so great that Justinian (483-565 A. D.) in his *Codex, Novellae Constitutiones*, 74, Ch. 4, instituted a new law compelling men to execute a dowry instrument or have the marriage ceremony performed in the Christian Church, stating therein: "It was provided by former and by our laws that marriage entered into without written marriage contracts and through mere marital intentions, should be valid and enforced. By reason of that, the Republic has become filled with fictitious contracts and witnesses come forward who lie with impunity that men and women living together have called each other husband and wife, and in this manner invent marriages which in fact were never contracted." This law was later modified. See, *Novellae Constitutiones*, 117, Ch. 4.

About a century later in the Visigothic Code, elaborate provisions were inserted covering marriages and providing that no marriage could be entered into without written dowry instruments, because "marriage is recognized to have a greater dignity and honor" in such case. The idea that contracts of marriage by mere agreement were probably not in the best interests of society and for the further reason that it would discourage concubinage impelled Pope Leo III about 900 A. D., Charlemagne in the West about 800 A. D., and King Edmund in England about 940 A. D., to make religious ceremony of marriage mandatory, as had been customary from early Christian times. See, *Beamnish* v. *Beamnish*, 11 Eng. Rep. 735.

The Roman Catholic Church had, almost from the beginning, encouraged marriages with religious ceremonies. Marriages entered into otherwise were, and gradually became more and more, odious to the prelates of the Church. The Canon Law was modeled after the Roman law, and the latter first permitted so-called common-law marriages and even concubinage. Due partly, no doubt, to Roman tradition, partly to anxiety to keep people out of meretricious relations and to make children legitimate, and doubtless partly to driving men out of or not retaining them in the Church, it recognized many clandestine unions as valid, though irregular, and presumed everything in favor of the validity thereof. And it did not prohibit marriages without religious ceremony until the Council of Trent (1545-1563), when in the twenty-fourth discussion in 1563, the "*Decretum de Reformatione Matrimonii*" was passed. Concubinage was condemned therein, and the validity of marriage made dependent on its being performed by a priest and in the presence of two or three witnesses. The proceedings of the Council were not accepted in England or France. However, under Henry III and Henry IV of France (1574-1606), religious ceremonies in connection with marriage became compulsory.

The authorities seem to be in agreement that up to the time of the Council of Trent the Canon Law provided that a marriage with words of present assent *(per verba de praesenti)* was valid. As to whether this was accepted as part of the common law of England, the answer was given in the affirmative in the case of *Dalrymple* v. *Dalrymple,* 2 Hagg. Const. 54 (1810), 17 English Ruling Cases 11. An opposite, negative answer was given to

the same question in the case of *The Queen* v. *Millis*, 10 Cl. & Fin. 544, 17 English Ruling Cases 66, which was carried to the House of Lords from the Irish courts and decided in 1844. Specifically, it was held in the latter case that a marriage by words of present assent without intervention of clergy was void. The case of *Dalrymple* v. *Dalrymple, supra*, which is quoted from in the Ross article, is concerned with Scottish law, not English law. It is interesting to note that under *The Queen* v. *Millis, supra*, and all other authorities agree, the parties to a marriage *per verba de praesenti* received no reciprocal rights in the property of the other, even after death.

Thus it seems that so-called common-law marriage is not derived from the common law of England. The case of *Denison, Admr.*, v. *Denison* (1871), 35 Md. 361, presents an excellent examination of the common law at the time this country was settled. The first time the validity of a so-called common-law marriage came before the courts of this country was in the case of *Fenton* v. *Reed* (1809), 4 Johns. (N. Y.) 52. Chancellor Kent, then chief justice of the appellate court, is credited with the opinion. He held that a contract of marriage made *per verba de praesenti* amounts to an actual marriage and is as valid as if made *in facie ecclesiae*. This decision seems to be the beginning of the doctrine of other cases as to the validity of common-law marriages.

However, such marriages are generally frowned upon in the United States. Thirty states do not authorize common-law marriage. The Colony of New Plymouth enacted legislation as early as 1636 to regulate the law of marriage and to discourage common-law marriage. On March 16, 1679, the General Assembly of New Hampshire passed legislation for the prevention of these common-law marriages. The Colonial Assembly of New York, on October 23, 1684, passed an act requiring marriage to be solemnized formally. This law was overlooked by Chancellor Kent in *Fenton* v. *Reed*, 4 Johns (N. Y.) 52. A Pennsylvania court said in *Baker* v. *Mitchell*, 143 Pa. Super. 50, 17 A. 2d 738, that common-law marriages ''are a fruitful source of perjury and fraud and * * * are to be tolerated not encouraged.'' A well-considered opinion on common-law marriage in the case of *In re Estate of McLaughlin*, 4 Wash. 570, 30 P. 657, observes, ''It is important that publicity should be

given to such contracts to guard against deceptions, and to provide accessible evidence to prove the relationship.'' During the time when common-law marriage was still considered valid in Nebraska, the Supreme Court of that state, in *Sorensen* v. *Sorensen*, 68 Neb. 500, 100 N. W. 930, on second rehearing, stated that the rule is ''alien to the ideas and customs of our people. It tends to weaken the public estimate of the sanctity of the marriage relation. It puts in doubt the certainty of the rights of inheritance. It opens the door to false pretenses of marriage and the imposition on estates of suppositious heirs. It places honest, God-ordained matrimony and mere meretricious cohabitation too nearly on a level with each other.'' In a similar vein, the Supreme Court of Oregon, in holding such marriages invalid, states in *Huard* v. *McTeigh*, 113 Ore. 279, 232 P. 658, 39 A. L. R. 528, that: ''In our opinion the doctrine of common-law marriages is contrary to public policy and public morals. It places a premium upon illicit cohabitation and offers encouragement to the harlot and adventuress. * * * Good government demands that our laws be obeyed in the solemnization of marriages as in all things else. An adherence to the law in this regard will tend to cause the parties to look with respect and reverence upon a contract which is the most sacred known to man, and which ought not to be lightly cast aside.'' And another court, in *Parke* v. *Parke*, 25 Haw. 397, well stated that: ''* * * The modern tendency, however, is to recognize marriage as something more than a civil contract for it creates a social status or relation between the contracting parties in which not only they but the state as well are interested and involves a personal union of those participating in it of a character unknown to any other human relation and having more to do with the morals and civilization of the people than any other institution. For these reasons there is a gradual tendency to protect the parties as well as society by reasonable requirements unknown to the common law but which at the same time are not burdensome nor calculated to discourage marriage among those who ought to assume that relation.'' We are in agreement with the philosophy of these various courts on this important matter.

Worthy of mention, too, is what the Supreme Court of the United States has declared in *Maryland* v. *Baldwin*, 112 U. S. 490, at 494, 28 L. Ed. 822, 5 S. Ct. 278:

"* * * it is proper to say that, by the law of Pennsylvania, where, if at all, the parties were married, a marriage is a civil contract, and may be made *per verba de praesenti*, that is, by words in the present tense, without attending ceremonies, religious or civil. Such is also the law of many other states in the absence of statutory regulation. It is the doctrine of the common law. But where no such ceremonies are required, and no record is made to attest the marriage, some public recognition of it is necessary as evidence of its existence. The protection of the parties and their children and considerations of public policy require this public recognition; and it may be made in any way which can be seen and known by men, such as living together as man and wife, treating each other and speaking of each other in the presence of third parties as being in that relation, and declaring the relation in documents executed by them whilst living together, such as deeds, wills, and other formal instruments. * * *."

In a notable opinion by the Court of Civil Appeals of Texas, *McChesney* v. *Johnson*, 79 S. W. 2d 658, is shown the circumspection with which that court reviews a claim of common-law marriage. The court said:

"* * *. We do not say that all the reasons for upholding common-law marriages have disappeared. We do say that the courts should review with care a common-law marriage claimed to have been contracted in the shadow of the county clerk's office and within the sound of church bells. If the conduct of such contracting parties does not show clearly an honorable abiding by such agreement before the eyes of their world of associates and contacts, then it should not receive judicial sanction. The agreement is fundamental and cohabitation is an element, but the holding out to the public as being man and wife is the acid test. * * *."

The covered wagon days are over. In this county no person lives, who cannot in some manner easily reach the county courthouse and partake of the beneficence of those who are by law endowed with the privilege authorizing and conducting the marriage ceremony. History has shown that at times, in years gone by, and still in some of the more remote parts of the United States, in order to get to a courthouse to obtain a marriage license, great hardships had to be undergone. In fact, in some

of the southern states, years ago, a couple would marry by simply jumping over a gun lying on the ground, in the presence of witnesses. And when the traveling minister would make his monthly or semi-annual trips to that section, they would have a church ceremony. By the wildest stretch of one's imagination, such could not be the case in Cuyahoga County, and most certainly not the fact in the case at bar. A fifteen minute ride would have brought them to the courthouse for the license, and they were within the sound of the church bells from all directions when this alleged common-law marriage was entered into.

The first case meriting our attention in Ohio is that of *Duncan* v. *Duncan,* 10 Ohio St. 181, decided prior to 1860. In that case the court, through Brinkerhoff, C. J., said:

"Finding ourselves, then, compelled by no preponderating forces of authority to the adoption of a doctrine so loose as that which would be necessary to sustain the marriage claimed to exist in this case, we are unwilling to do so. It seems to us that grave considerations of public policy forbid it; that it would be alien to the customs and ideas of our people, and would shock their sense of propriety and decency. That it would tend to weaken the public estimate of the sanctity of the marriage relation; to obscure the certainty of the rights of inheritance; would be opening a door to false pretenses of marriage, and to the imposition upon estates of suppositious heirs; and would place honest, God-ordained matrimony, and mere meretricious cohabitations too nearly on a level with each other."

See, also, *Carmichael* v. *State,* 12 Ohio St. 553.

The Ohio law on common-law marriage is clearly enunciated in the case of *In re Estate of Redman,* 135 Ohio St. 554. In a *per curiam* opinion, the court said that the sole question presented in that case was whether there was a common-law marriage between the parties. This is exactly the question before us in the instant case. The court there reviewed the essential requirements for such a marriage as set forth in the syllabus of *Umbenhower* v. *Labus,* 85 Ohio St. 238, which reads:

"An agreement of marriage *in praesenti* when made by parties competent to contract, accompanied and followed by cohabitation as husband and wife, they being so treated and reputed in the community and circle in which they move, establishes a valid marriage at common law, * * *."

The legitimacy of children was involved in the *Umbenhow-*

*er case,* wherein Judge Price, speaking for the Supreme Court, said, at page 249:

"* * * In this respect, as in many others, there is always a stratum of society that prefers to shun or disregard legal ceremonies and adopt a coarser and less conspicuous way of forming domestic ties. It is the innocent offspring of such citizens that the law would mercifully protect, and rather call them heirs than bastards."

So we have required in *Umbenhower* (a) an agreement *in praesenti;* (b) by competent parties; (c) followed by cohabitation; (d) a holding out; and (e) reputation. The Supreme Court of Ohio firmly and clearly stated in *In re Estate of Redman,* 135 Ohio St. 554, at page 558:

"So-called common-law marriage contravenes public policy and should not be accorded any favor; indeed, it is quite generally condemned. *It is well settled in Ohio that to establish a common-law marriage, all the essential elements to such a relationship must be shown by clear and convincing evidence.* * * * In the *Umbenhower case, supra,* the legitimacy of a child was involved and was an important factor in the decision of that case. *Even in such cases, the essential elements of such marriage must be established by the degree of proof stated.*

"* * *. So long as common-law marriage has any recognition, the requirements as to proof must be rigidly applied and enforced." (Emphasis added.)

This definitive statement as to the essentials of common-law marriage in Ohio, the proof required therefor, and the command implicit in the *per curiam* opinion, we are bound to follow. We apprehend no uncertainty or confusion about it.

As the court below specifically found, all the elements of a common-law marriage were not established in the instant case by clear and convincing evidence. Therefore, the ruling of that court that a common-law marriage existed by reason of an agreement of marriage *per verba de praesenti* alone being established by clear and convincing evidence is contrary to law and prejudicially erroneous to the appellant herein.

ASSIGNMENT OF ERROR No. 5.

The Probate Court below erred in not allowing Isabella Soeder Ohlman to remain in the courtroom during the entire course of the trial.

Isabella Soeder Ohlman is the sister of the deceased and

one of the primary beneficiaries of the will of the decedent. As such she was served with notice of the filing of the exceptions to the inventory and appraisal.

She was excluded from the courtroom by virtue of a ruling of the Probate Judge ordering a separation of witnesses. During the period of exclusion, three witnesses were examined, denying counsel for the executrix the opportunity to advise with Mrs. Ohlman as to her knowledge of such witnesses, and denying her the right to cross-examine such witnesses if she chose.

The record discloses that counsel for the executrix moved for a separation of witnesses, whereupon a controversy arose as to whether Mrs. Ohlman, sister of the executrix and one of the heirs under the will, was a party to the action and as such had a right to sit in the courtroom. The position of the exceptor's counsel was that "the only necessary party on exceptions to the inventory by statute is the executrix or administratrix. That is the only person I made a party, as far as this ex parte proceeding is concerned."

The ruling of the court was, as appears in the record, that "The court is of the belief that the only party that is a party to this is the executrix, and the other witnesses, although they may have an interest, are not permitted to remain during the testimony of these witnesses, in the court's opinion," to which ruling an exception was taken by executrix.

A moment later the court added: "2115.16 says notice of exceptions to be given only to the executor and attorney. So following that, we believe the ruling is correct." Mrs. Ohlman was thus excluded from the courtroom during the testimony of three witnesses, one of whom was Catherine Sands, whose testimony alone was accepted by the court as proof of the agreement *in praesenti*.

We note the following in the record:

"Mr. Rippner: Your Honor, I want to make one change. I am a little disturbed about an error in this case, and I have talked to my associates. In order to avoid any question of error, I want to waive any objection to have the sister in the room."

The following appears, in response to the court's inquiry, as to her identity:

"Mr. Rippner: Isabella Ohlman. You can have her in the room.

"Mr. Fornes: Okay.

"The Court: You, then, Mr. Fornes, waive any objection to the fact that she has not been in the room"

"Mr. Fornes: No, your Honor.

"The Court: You do not. Let the record so indicate.·

Thereupon, Mrs. Ohlman entered the courtroom. Section 2115.16 of the Revised Code reads in part as follows:

"Upon the filing of the inventory required by Section 2115.02 of the Revised Code, the Probate Court shall forthwith set a day, not later than one month after the day such inventory was filed, for hearing on the inventory and shall give at least ten days' notice by registered mail or otherwise of the hearing to the executor or administrator and to such of the following as are known to be residents of the state and whose place of residence is known:

"(A) Surviving spouse;

"(B) Next of kin;

"(C) Beneficiaries under the will;

"(D) The attorneys, if known, representing any of the aforementioned persons."

In 52 Ohio Jurisprudence 2d 525, Trial, Section 44, it is said:

"In civil cases, as well as in criminal prosecutions, every party thereto is entitled to be present in the courtroom and to be represented by counsel at all stages during the actual trial of the action. * * *."

The cases cited in support of the foregoing statement do not aid us since they relate to full and complete trials, both civil and criminal.

It should be noted that that part of Section 2115.16 of the Revised Code provides that notices of the filing of the inventory and the date of hearing thereon shall be given to the persons enumerated therein.

The remaining part of Section 2115.16, Revised Code, provides for the filing of exceptions to the inventory and then provides:

"* * * When exceptions are filed notice thereof and time of hearing thereon shall forthwith be given to the executor or administrator and his attorney by registered mail or by personal service, unless such notice is waived. At the hearing the execu-

tor or administrator and any witness may be examined under oath. * * *."

In view of appellant's complaint, the question arises—does the fact that the statute quoted requires notice of the filing of the inventory and the hearing thereon, and prescribes notice of filing of exceptions to the inventory and hearing thereon upon the fiduciary and his attorney, constitute the persons named as "parties" in the sense that such term is understood in proceedings that are adversary in their nature in actions instituted wherein a court exercises plenary power in conformity with its jurisdiction?

The Supreme Court of Ohio in the case of *In re Estate of Gottwald,* 164 Ohio St. 405, defines the nature of the proceedings dealing with our problem. In paragraph one of the syllabus the court held:

"1. The hearing of exceptions to an inventory under Section 2115.16, Revised Code, is a summary proceeding conducted by the Probate Court to determine whether those charged with the responsibility therefor have included in a decedent's estate more or less than such decedent owned at the time of his death."

In its opinion, at page 409, the court, speaking of Section 2115.16, Revised Code, said:

"That section provides that upon the filing of exceptions the executor or administrator shall be notified thereof and a hearing shall be conducted at which the executor or administrator and any witness may be examined, and that the finding of the court shall be entered on the journal. There is no provision in the statute for pleadings as they are known in the ordinary civil action, and there is no provision for the summoning of witnesses or additional parties, which might be necessary for a complete determination of the rights of the parties. The statute provides for a summary proceeding, as part of the Probate Court's overall supervision of a decedent's estate, to determine whether those charged with the responsibility therefor have included in the decedent's estate more or less than he owned at the time of his death."

It is quite apparent from the foregoing language that the proceedings herein were a summary action as distinguished from a civil action, plenary in scope.

We therefore conclude and hold that the exclusion of Mrs. Ohlman was not error.

Assignment of error No. 6 urges that the Probate Court erred in not permitting the introduction of estate's Exhibits 67 and 68.

The witness, Maxwell Kelso, was subpoenaed by the estate to bring in the work records of Catherine M. O'Connell while she was employed as a sales clerk for Sterling Linder Davis Company. Two of the records he brought with him were confessions that Catherine M. OConnell allegedly had signed, admitting theft of certain sums of money from the employer.

Appellant argues:

"In a case which requires clear and convincing evidence of the material fact, the moral character of the person making the claim should be considered by the court in determining truth and veracity of the witnesses who took the stand in her behalf."

We have searched the record and note that Carterine M. O'Connell did not take the witness stand in this case. That being true, she did not and could not put her character in issue. We know of no rule of law by virtue of which the executrix would be justified or allowed to impeach the character of the exceptor-claimant. The obvious purpose of the exihibits as alleged confessions of larceny was to impeach her character. It is our conclusion and we hold that there was no error on the part of the trial court in excluding these exhibits.

Assignment of error No. 7 is as follows:

"The Probate Court below erred in not permitting the testimony of Father Casper Heimann, Father Victor Ranly and Monsignor Kirby."

The first of these witnesses called was Father Heimann who was subpoenaed by the executrix to bring in certain records. He testified that he had no records to bring. He had been the pastor of Immaculate Conception Church in Cleveland during 1957 or 1958. Edward A. Soeder at that time lived within the parish and was a member of Immaculate Conception Church by that fact of residence. Father Heimann testified that he visited Mr. Soeder at his home "in the course of census calls and ordinary calls that a priest makes with his parishioners."

The interrogation and colloquy proceeded as follows:

298

"Q. Now, Father could you tell us what the procedure was that you followed when you visited Mr. Soeder in 1957 and 1958 in making the census? A. It would be a combination of business and social call, a little bit.

"Q. By 'business' do you mean your priestly duties? A. Religious affiliation and things that are associated with it. Socially, it was a means of becoming acquainted with the parishioners, and I was rather newly appointed at Immaculate Conception and felt it was my duty to become acquainted with those who were members of that parish."

Parenthetically, it should be noted that earlier in the examination of Father Heimann counsel for the exceptor had asked the court to let the record show an objection to every question asked of Father Heimann by the attorney for the estate, and this was allowed by the court.

Thereupon, the following statement was made:

"The Court: The court will sustain the objection as to any visits made by the good father to Mr. Soeder in respect to this 'priestly business' as stated by Mr. Fornes.

"Therefore, Father, you need not answer any questions relating to your relationships with Mr. Soeder in so far as the pastor of that church, but in so far as a social visit you may answer.

"Do you understand, Father?

"The Witness: Well, your Honor, I think it is rather hard to sometimes divide between social. When I say 'social,' I don't mean—

"The Court: I understand.

"The Witness —dinner appointments or attending events, or anything of that sort, socially. I mean in the sense that it is a personal call, when I say 'social.'

"The Court: Well, Father, it is the intention of this court to protect and preserve the conduct of your business as the head of the church with any individual.

"So what happened between you and that individual, in so far as the conduct of church business or relating to church matters or to your calling as a priest and this person being one of your flock, it is the intention of this court not to go into those matters because it is not the affair of this court, pursuant to this statute that was read earlier.

"Do you understand, Mr. Fornes?

"Mr. Fornes: Judge, I don't think we are going to have a situation where a confession was heard at this man's house.

"The Court: I believe the statute goes beyond the confession. It says in the course and conduct of the church affairs or church business, if I recall it correctly.

" " * * *

"The Court: * * * Mr. Fornes, here it says that 'The following persons shall not testify in certain respects:

" 'A clergyman or priest, concerning a confession made to him in his professional character in the course of discipline enjoined by the church to which he belongs.'

"The court is interpreting that any business that this priest had with the parishioner, although it may not be a confession in the sense that you understand it as a Catholic, it is the nature of such business that this court feels that the conduct of business between a priest and a parishioner is not something for general knowledge and should not be made available on examination such as this.

"However, any relationship that the priest had with his parishioner as a friend or as a social caller in the context that the Father explained it earlier will be admitted because it is beyond the precinct of the church, if you understand my meaning.

"But the court believes that the law is such that it protects the discussions between a priest and a parishioner or a pastor and a parishioner at all times.

"Do I make myself clear?

"Mr. Fornes: You make yourself clear, your Honor, but I would like an exception to your ruling.

"The Court: You may have an exception.

"Mr. Fornes: Thank you.

"Q. Father, what is known in the Roman Catholic Church as a confession?

"Mr. Rippner: I object to this, your Honor.

"The Court: Objection sustained.

"Mr. Fornes: May I proffer the answer?

"(Whereupon the following proffer was made by Mr. Fornes:

"Mr. Fornes: In the Roman Catholic Church, a confession is an outward sign instituted by Christ, being a sacrament also

known as penance. This sacrament is used for the purpose of forgiving sins, and this priest is an instrument in forgiving these sins.

"One of the most stringent rules of the Catholic Church is that no priest shall, at any time, reveal any information that he receives at a confession, which confession normally takes place in the confines of a confessional box.)
" * * *

"Q. Now, in connection with your visits as pastor of the parish in connection with making the census, did you have any conversation with Mr. Soeder regarding his marital status?

"Mr. Rippner: I object, your Honor. He said 'as pastor of the parish.' As a priest now.

"The Court: The court heard what counsel said. Did you object?

"Mr. Rippner: Yes.

"The Court: Objection sustained.

"Mr. Fornes: I proffer the following:

"(Whereupon, the following proffer was made by Mr. Fornes:

"Mr. Fornes: 'Yes, I did.' The next question, 'And what were these conversations? What did Ed say to you and what did you say to Ed?' and you will show an objection and I will proffer that the answer was that 'Ed told me that he had been a single man all his life and that as far as I know, from Ed's conversation, Ed was a bachelor all of his life.' "

In the common law of evidence there was no recognized distinction between clergymen and laymen as to the privilege for confession. This is now changed by statute in Ohio as well as other states. The provisions of Section 2317.02, Revised Code, apply only to those confessions which are made to the clergyman or priest professionally, and in the course of discipline enjoined by the Catholic Church. See, *People* v. *Gates,* 13 Wend. (N. Y.) 311; 8 Wigmore, Evidence, Section 2394 (McNaughton rev. 1961).

That statute has a direct reference to the church's "discipline" of and for the clergyman and as to his duties as enjoined by its rules or practice. What is the discipline that binds the Roman Catholic clergy to secrecy?

Canon Law is the collected body of laws, rules and regulations enacted by the Roman Catholic Church concerning its con-

stitution, its spiritual and temporal administration and the ecclesiastical government and discipline of the Catholic religious community. Just as the Catholic Church is a religious society distinct in its purpose from secular society, so Canon Law is distinct from the civil law. The former is concerned with the spiritual and moral welfare of the community, having as its final end the eternal salvation of souls; the latter treats temporal and secular interests, the preservation of peace and order, and the economic, social, political and cultural life of the community.

Canon Law includes only the law which the church has made for itself through its own legislative organs. The laws made by the state concerning the church and its institutions are not part of the Canon Law unless the church has adopted them and inserted them in its own legal system.

The present body of Canon Law was assembled and enacted in the form of a modern code, known as the *Codex Juris Canonici,* and promulgated by Pope Benedict XV on May 27, 1917. The subject matter, whose classification is modeled upon that of Roman law, is divided into five books, each having several subdivisions. The canons are numbered from 1 to 2414. The first book, *Normae Generales* (Can. 1-86), serves as a general introduction and deals with the nature and purpose of canonical laws and their classification and application. The second, *De Personis* (Can. 87-725), contains laws concerning persons, the Pope, the bishops, the clergy, and the laity. The third, *De Rebus* (Can. 726-1551), deals with spiritual and temporal matters and institutions instrumental to the fulfillment of the mission of the church. The fourth, *De Processibus* (Can. 1552-2194), regulates the exercise of the judiciary power of the church. The fifth, *De Delectis et Poenis* (Can. 2195-2414), declares the rules and regulations of the jurisdiction and procedure of ecclesiastical criminal courts and the punishments for specific crimes. See, Canon Law, by A. G. Cicagnani, translated from Latin by J. M. O'Hara and Francis Brennan.

Canons 889, 890 and 2369 absolutely seal the lips of the clergy and provide for punishment should any reveal what particular confessants tell them in confession. The seal of confession, *sacramentale sigillum,* was recognized by the Roman Catholic Church in the 4th Lateran Council, 1215.

Ohio's statute is based on sound policy—reason and ex-

perience—which concedes to religious liberty a rule of evidence that a clergyman shall not disclose on a trial the secrets of a penitent's confidential confession to him. Knowledge so acquired in the performance of a spiritual function is not to be transformed into evidence to be given to the whole world. The benefit of preserving this confidence inviolate overbalances the possible benefit of permitting litigation to prosper at the expense of the spiritual rehabilitation of the penitent. The rules of evidence have always been concerned not only with truth but with the manner of its ascertainment.

In the application of the statutes, exact and similar to the Ohio statute, it has been held, following the dictates of principle, that the privilege applies only to a communication made in the understood pursuance of that church discipline which gives rise to the confessional relation, and, therefore, in particular to confessions of sin only, not to communications of other tenor. See, 8 Wigmore, Evidence, Section 2395 (McNaughton rev. 1961).

The testimony sought to be elicited from Father Heimann by the interrogation on behalf of the estate was relevant and material to the marital status of the decedent, Edward A. Soeder, which was in issue at the hearing. Such testimony as disclosed by the proffers was not in the nature of a confession made to Father Heimann in his professional character in the course of the discipline enjoined by the Roman Catholic Church, of which Edward Soeder was a member and Father Heimann was a pastor. The ruling of the trial court as demonstrated above was that such testimony from Father Heimann was objectionable, and it was excluded. Thereby, the trial court was in error, and this error was prejudicial to the estate, as claimed in the first branch of claim of error number seven.

The second branch of such claimed error relates to the witness, Father Victor Ranly, who was subpoenaed as a witness by the estate.

He was the pastor of Our Lady of Good Counsel Church on Pearl Road and was subpoenaed to bring certain records. The subpoena reads, in part, as follows:

"* * * and have him bring with him census records and records of registration of the family of Helen B. O'Connell, widow and her daughter, Catherine O'Connell, who resided at

4417 Gifford Avenue, Cleveland, Ohio during the years 1953 through 1957. * * *."

The record demonstrates this series of questions, answers and colloquy between the attorneys, the court and the witness.

"Mr. Fornes: Were you subpoenaed to bring in certain records, Father? A. Yes, I was.

"Q. May I see them, please?

"Mr. Rippner: I object, your Honor, even to him seeing a record that is a church record.

"Mr. Fornes: All I have got so far, your Honor, is the subpoena.

"The Court: The subpoena requests the Father to bring with him census records and records of registration of a certain family on Gifford Avenue.

"In view of the statement the court has made earlier about even census matters being part of the official business of the church, these records will not be admitted. However, if Father did bring them along, you may proffer them in evidence.

"For the Father's understanding, this court has ruled that any matters concerning a church and its parishioners are peculiarly within the business of the church and the parishioner, and therefore, the priest or pastor or rabbi does not have to testify and will not be required to testify in respect to these matters in this court.

"In case the court is overruled in this thinking, the attorney for the estate, who has subpoenaed you here, has the right to proffer privately and quietly into the record what he thinks the records or the information would show, but the court feels that the business of the church and her members must be protected at all costs because that is the foundation of our country.

"Proceed, Mr. Fornes.

"Q. May I see the records, Father? A. Well, it is really not a census record—

"Mr. Rippner: I object. I would like to have him talk to the judge and Mr. Fornes outside of the record, because I don't want him to identify the records, they are so privileged.

"The Court: That is correct. If you have some records, you may give them to Mr. Fornes without any comment, Father. If Mr. Fornes wants to read them into the record, he may do them privately and quietly.

304

"Mr. Rippner: Mr. Fornes.

"(Discussion off the record.)

"Q. May I see the other records? A. These really are not pertinent.

"The Court: Let the record show that Mr. Fornes is asking for some other records from the Father, and the Father says, 'These are the only records I brought.'

"Q. Did you bring any unpertinent records, Father? A. No.

"Mr. Rippner: Your Honor, is this for the record?

"The Court: The court dislikes any conversation that is not for the record.

"Mr. Rippner: Can I object, then, your Honor?

"The Court: Object as to what, Mr. Rippner?

"Mr. Rippner: To what he is saying to the Father, and the Father must, of necessity, answer him back out of courtesy.

"The Court: Very well. You may object.

"Mr. Rippner: I object to it.

"The Court: The objection is overruled.

"Mr. Rippner: Note exception.

"(Discussion off the record.)

"Q. Now, Father, you just gave me a piece of paper that related to a person other than Catherine O'Connell, did you not?

"Mr. McCarthy: Objection.

"A. Yes.

"The Court: You may answer.

"Q. Now, did you bring any records with you that relate to Catherine O'Connell?

"Mr. McCarthy: Objection.

"The Court: I believe he has already answered that. Did you bring that record in response to the subpoena that you received, which is a record of this court?

"The Witness: How much can I say?

"The Court: Just say yes or no.

"The Witness: I brought this, yes.

"The Court: And that subpoena asked for all of the records—well, I see that this asked for a little bit more than that.

"Go off the record a minute.

"The Court: Back on the record.

"Q. In other words, Father, you did not bring any records relating to Catherine O'Connell; is that correct?

"Mr. McCarthy: I object.

"The Court: He may answer.

"A. I would have to say no, although there is a reference to it. How far can I go?

"The Court: The court thinks you have gone far enough. The court believes that you have responded to the subpoena as best you were able to do.

"The court holds that these records, if any, would be privileged communications which would not be introduced, and the court will, therefore, excuse the Father from answering these questions in this manner.

"Mr. Fornes, if you wish to continue, if there are any questions you want to ask the Father relating to any social approaches he might have had with any of the people connected with this case, that is another thing, but any records or statement of conversation pertaining to the relationship of this priest or any other priest to a member of his flock or of his parish will not be permitted to be answered.

"Mr. Fornes: All right. Your Honor, I would like to finalize one final question and proffer my answer as far as records are concerned. Is that all right?

"The Court: Fine.

"Q. Father, you stated that you brought records that relate in some way to Catherine; is that right?

"A. Yes.

"Mr. Rippner: I object, your Honor.

"Q. May I have those records?

"Mr. Rippner: Object.

"The Court: The objection as to having the records is sustained. However, the records will be given to Mr. Fornes, if he wishes to proffer them. This court will not allow them into evidence at this time or any other time.

"* * * *"

The court below was in error in holding that the records called for by the subpoena duces tecum were privileged and as such not admissible. The bill of exceptions is unclear as to the materiality or relevancy of the records produced by the witness in answer to the subpoena. However, the attorney for the estate was unduly and improperly restricted by the court in proffering whatever papers the witness brought pursuant to the subpoena and thereby perfecting the record for appeal.

The third branch of this assignment of error relates to the testimony of Monsignor Edward A. Kirby. He is the pastor of St. Rose of Lima Parish in Cleveland and was subpoenaed as a witness for the estate, and the bill of exceptions discloses the following questions, answers and colloquy on direct examination by Mr. Fornes:

"Q. Have you been subpoenaed to bring in certain records, sir? A. Do you want the subpoena?

"Q. What records did you bring in?

"Mr. Rippner: Objection, your Honor.

"The Court: Objection sustained on the basis of the previous ruling made by this court that any records kept by a priest made in conjunction with his duties as a priest and a pastor of a parish is privileged information and need not be yielded to this court.

"However, if you wish to proffer that evidence for the record, Mr. Fornes, you may do so.

"Monsignor, this court feels that any relationship between a parishioner and the head of his church is of such a nature that it must be privileged, and that cannot be admitted into evidence because of the fact that it violates the very nature of the belief of this country that we have that everyone should be free to discuss with their pastor whatever matters they might wish to, whether it be in the confessional or the person's home or the street. That is the way we are ruling.

"Mr. Fornes: Would you mark this as estate's Exhibit 95?

"The Court: You will not mark it as anything.

"You may proffer it, Mr. Fornes, but that paper will leave here with the Monsignor.

"Mr. Fornes: As I understand your ruling, your Honor, I am not permitted to even have a photostat of this exhibit placed into the evidence, I am not permitted to mark it, and the only thing I am permitted to do is to proffer it by reading it into the evidence?

"The Court: That is exactly clear. You have a clear and unequivocal understanding of my ruling.

"Mr. Fornes: May I have an exception, your Honor?

"The Court: Certainly. Mark the exception.

"Mr. McCarthy: Show a continuing objection to the introduction of this detail or whatever is on that card.

"Mr. Fornes: Are you finished?

"Mr. McCarthy: Yes.

"Mr. Fornes: The question would be:

"(Whereupon the following was proffered by Mr. Fornes:

"Father, what I have in front of me is a card showing the name 'Miss Catherine O'Connell.' Could you identify that?

"Proffered answer:

" 'This is the registration card of Miss Catherine O'Connell, 1286 West 105th Street, Cleveland, Ohio, which information was given to me shortly after Miss Catherine O'Connell moved to 1286 West 105th Street, Cleveland, Ohio, at which time she told me that she was living with her mother, Helen, who was a widow, and that she was employed by the city hall, and that her marital status was single.

" 'Approximately when did this conversation take place, Father?

" 'Sometime in the latter part of the year, 1964.

" 'Where did this conversation take place?

" 'At the rectory.

" 'That is all.')"

Again, the court below erred to the prejudice of the estate, and as being contrary to law, in sustaining the objections to the above evidence of the parish registration of the exceptor and alleged common-law wife of the decedent, because such evidence is material and relevant to her marital status. This information by any flight of the judicial imagination cannot conceivably be considered as a confession made to Monsignor Kirby in his professional priestly character in the course of the discipline enjoined by the Roman Catholic Church and, of course, is not privileged.

The eighth assignment of error relates to the excusing of a Father Butler by the Probate Court as a witness while he was under subpoena by the estate and before he had been called to testify. The bill of exceptions unfolds the situation as follows:

"The Court: For the record, Mr. Fornes, Judge Merrick, the presiding judge in this court, has just handed me a subpoena to a Father Butler. He has not appeared here in this case, but he was subpoenaed by you.

"Mr. Fornes: I believe Father Butler was outside, but I think that he left, did he not?

"The Court: Yes, Judge Merrick excused him.

"Mr. Fornes: Your Honor, I would like to have Father Butler in this court room so that I could at least ask him the pertinent questions, that I believe are pertinent, your Honor.

"The Court: Mr. Rippner?

"Mr. Rippner: In the furtherance of justice, I will be willing to have him proffer the questions, proffer the answers, have this court overrule, if he felt the same way, if the questions are the same, so as to have it in the record as if the Father were here.

"Mr. Fornes: That is not my purpose, to merely bring out proffered evidence. I am interested in getting in evidence in this court, and I would like to have the Father here so that I can ask him the questions.

"The Court: Very well, Mr. Fornes, Judge Merrick, as you know, is presiding judge in this court, and he did excuse the Father.

"I will give you this subpoena, and if you will discuss it with Judge Merrick, then we will follow through for you.

"Is that agreeable to you?

"Mr. Fornes: That is agreeable, your Honor.

"The Court: Very well. Call your next witness."

The subpoena duces tecum served on Father Butler by leaving a copy thereof at his residence asked for the production of certain records in this language:

"* * * and have him bring with him the census records relating to Edward A. Soeder, 1635 East 38th Street, Cleveland, Ohio for the years 1956 to date."

Later, the trial judge recessed the hearing to give counsel for the estate time to talk to the judge who had excused the priest under subpoena, before the latter testified. It is disclosed in the record that, after conferring with the second judge, counsel for the estate was not ready to proceed inasmuch as he had planned to use as a witness the priest who had been thus excused. It developed further, as shown by the record, that a second clergyman under subpoena at that time and present outside the courtroom had left the building before testifying and without being supposedly excused by anybody.

The trial was recessed over the weekend, and Father Butler did not appear on the following Monday, although importuned

by counsel for the estate, according to the latter's statement to the court at the time the hearing was resumed. The subpoena was proper, and the service was in order and acknowledged by the witness by his appearance. The excusing of the witness under the circumstances was irregular and without reason in law, although the record does not demonstrate that it was prejudicial to the estate.

The ninth assignment of error claims that the Probate Court erred in allowing the introduction of exceptor's Exhibits A, D, F, I, R, and S (all photographs), and TTT and VVV (all letters). We find no error in connection with this claim.

As assignment number ten, appellant urges that the Probate Court below erred in its ruling on the reading of the deposition of John O. Dissinger. This deposition was properly taken by the executrix in Florida with counsel representing the exceptor and counsel representing the executrix in attendance, and examination and cross-examination was had. Objection to the deposition being read at the hearing was made by counsel for the estate, at whose instance the deposition was taken. The ruling of the court below in permitting the entire deposition to be read is correct, but not for the explanations given by the court. A deposition may be read in any stage of the action or proceeding or in any other action or proceeding upon the same matter between the same parties, subject, however, to such exceptions as are taken thereto under the provisions of Sections 2319.28 to 2319.31, Revised Code. See, Section 2319.21, Revised Code, and *Gorman, Admx.*, v. *Columbus & Southern Ohio Electric Co.*, 144 Ohio St. 593. A deposition taken by one party may be used by the other. Where the deposition of a witness is taken by plaintiff upon notice given, and the same is regularly filed with the clerk of court, it thereby becomes a part of the papers in the case and may be used as evidence by the defendant, although no cross-examination of the witness was had. And if a party reads part of his examination, the adverse party may read the rest. See, *Despatch Line* v. *Glenny & Co.*, 41 Ohio St. 166. Assignment of error No. 10 is, therefore, overruled.

It is claimed in assignment of error number eleven that the finding of the Probate Court below in favor of the exceptor is contrary to law, and that the court should have found in favor of the estate. We have disposed of this question in our consid-

eration of assignment of error number four, *supra*. Similarly, we have also disposed of claimed error number twelve in connection with the same assignment of error number four.

Taking up now the claims of error in appeal No. 27584, we have considered the question presented in assignment number one in our disposition of assignment number two of appeal No. 27581, *supra*. Likewise, we have disposed of claim of error number two in the second appeal in our consideration of assignment number four of appeal No. 27581.

Assignment of error No. 3 reads:

"Error claimed as to words *in praesenti* being proved by clear and convincing evidence."

It is argued that the exceptor's witness, Veronica Saley, in her testimony refers to four persons being present at the alleged common-law marriage, namely, Mrs. McCullough, Edward A. Soeder, Catherine O'Connell and Mrs. Saley herself and that, although Mrs. McCullough testified on behalf of the exceptor, she did not confirm this testimony of Mrs. Saley. This failure, it is urged, should cast grave doubt that exceptor-appellee proved words *in praesenti* by clear and convincing evidence.

Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of the fact a firm belief or conviction as to the facts sought to be established. It does not mean clear and unequivocal. See, *Cross* v. *Ledford,* 161 Ohio St. 469.

Whether this degree of proof is the requirement, a reviewing court will examine the record to determine whether the trier of the facts had sufficient evidence before it to satisfy the requisite degree of proof. The mere number of witnesses alone, who support a claim of one side, is not to be taken as the test. The degree of proof required is determined by the impression which the testimony of a witness or witnesses makes upon the trier of the facts, and the character of the testimony itself. Credibility, intelligence, freedom from bias or prejudice, opportunity to be informed, the disposition to tell the truth or otherwise, and the probability or improbability of the statements made, are all tests of testimonial value. The trial judge heard

this witness and was in the best position to evaluate her testimony. We can assume that he properly evaluated same, and obviously it was sufficient to produce in his mind a firm belief or conviction of exceptor's allegations. Under this situation a reviewing court may not as a matter of law substitute its judgment as to what facts are established by the evidence for that of the trial court.

The fact that Mrs. McCullough did not confirm the Staley testimony certainly could not be considered by the trial court for the very simple reason that one would have to be clairvoyant to know what her testimony on that point would be, and, secondly, the exceptor's lawyers are perfectly capable of formally presenting their side of the lawsuit. It is entirely conceivable that such testimony from the witness was withheld for tactical or strategic trial reasons.

The fourth assignment of error claims that "barring the courtroom to an heir under the will and at law was error." We have considered this question under assignment of error number five, *supra*, and found no error therein.

Accordingly, for the reasons given, the judgment of the Probate Court is reversed in each appeal as being contrary to law, and the judgment that should have been rendered in the Probate Court in each appeal is hereby rendered in this court, namely: (1) a common-law marriage is not established by the facts and the supporting evidence in this case; (2) the exceptor, Catherine M. O'Connell, is not entitled to any rights as surviving spouse and heir-at-law in the estate of Edward A. Soeder; and (3) the exceptions to the inventory and appraisal filed on behalf of exceptor, Catherine M. O'Connell, are overruled. It is ordered that a special mandate shall issue from this court directing the Probate Court to carry this judgment into effect in each appeal.

*Judgments reversed.*

Artl, C. J., concurs.

Wasserman, J., dissenting in part. In reaching a decision it was necessary to analyze the record of testimony in this case and to interpret it in the light of the decisions of the courts of this state insofar as they are applicable.

In *Carmichael* v. *State* (1861), 12 Ohio St. 553, the Supreme Court (through Gholson, J.) stated on page 559, that:

"* * * The requisites to constitute a valid marriage, independent of any positive law, have been stated in many authorities, but it must still be a question on the facts of the particular case. It may be, that in most cases a ready answer may be given upon any statement of the facts, whether there was a marriage or not, and those who were present at the time the consent was given, and cognizant of the conduct, toward each other, of the parties thereafter, could very rarely fail in forming a correct conclusion. * * *."

An examination of the cases subsequent to *Carmichael* reveals that the Supreme Court carefully examined the facts in each case. While the Supreme Court may have strayed from its formula in the *Carmichael case* when deciding the case of *In re Estate of Redman* (1939), 135 Ohio St. 554, it was quick to correct itself in *Markley* v. *Hudson* (1944), 143 Ohio St. 163, which is the most recent decision of that court on this particular subject. The Supreme Court in the *Markley case* reversed the Court of Appeals, which had relied on the *Redman* decision, and stated on page 167 (Hart, J., speaking) that:

"* * * This court still adheres to the doctrine that it is essential to show an agreement between the parties *in praesenti* to become husband and wife in order to establish a common-law marriage, but this does not mean that such proof must establish an express agreement resulting in contract, or that such result may not be established by circumstances from which an agreement *in praesenti* may be inferred. * * *."

In commenting upon the Supreme Court's decision in the *Markley case,* the Court of Appeals for Stark County, in the case of *Ryan* v. *Ryan* (1948), 84 Ohio App. 139, stated (Montgomery, J.) on page 144:

"* * * the principle announced in the *Redman case* was explained and broadened by the later decision of the Supreme Court in the case of *Markley* v. *Hudson,* 143 Ohio St. 163, 54 N. E. 2d 304. So that in our judgment the *Redman case* is no longer of any value. * * *."

The court then reiterated the rule announced in the *Carmichael case,* after which it continued with the declaration that

when dealing with common-law marriages each case must be decided upon its particular fact situation.

"* * *. And, as stated by the Supreme Court in the course of the opinion in the case of *Johnson* v. *Wolford*, 117 Ohio St. 136, 141, 157 N. E. 385, all common-law marriage cases are decided upon the peculiar facts of those cases. * * *"

The important factor in common-law marriage appears to be the intent of the parties, *i. e.*, did they intend a marriage. This intent may be inferred from the contract of marriage alone where there is direct testimony to such contract. However, where such evidence is not available, the courts will look to the conduct of the parties. From this conduct, the courts will determine the intent of the parties. So, in the *Markley case,* the court stated that the conduct of the parties established the contract of marriage.

The clearest discussion of the question of the intent of the parties is the decision of the Supreme Court in the *Carmichael case, supra*. In reaching its judgment, that court relied solely on an English case, *The Queen* v. *Millis*, 10 Cl. & Fin. 544, 17 English Ruling Cases 66, wherein the court stated that in all cases the words *"in praesenti"* may not be sufficient to prove marriage and the court may rely upon other circumstances to prove the intent of the parties. The court in *Carmichael* (12 Ohio St. 553) quoted extensively from that case, on page 560, as follows (quoting in part, Lord Broughan in *Millis*):

"* * * 'I do not say all marriages are valid where *verba de presenti* are used. Those marriages only are so, where the force and effect of the *verba de presenti* are to bind the parties by this contract, without reference to, or contemplation of, any future ceremony. If the parties plainly contemplate a future solemnization, they only bind themselves in the event of that taking place, then their contract is executory and conditional, not executed and absolute.' Id. 708. '*A solemn contract of marriage executed per verba de presenti, does in fact constitute a marriage.*' Id. 821, Lord Denman. To constitute a marriage, it must appear from the acts of the parties, for words on such an occasion are acts forming a part of the *res gestae*, that they did, in the homely but strong language of our statute, 'join together as husband and wife.' " (Emphasis added.)

In the instant case there is a unanimity of opinion that the parties contracted by words *in praesenti* to marry—this is clearly revealed by the record of evidence. There was no need, as in the *Markley case,* to prove the contract by circumstantial evidence. Furthermore, the record is replete with testimony by uninterested witnesses that the parties to the marriage contract cohabited and that they held themselves out as husband and wife to friends, family, acquaintances and business associates. The record, I believe, reveals the requisite intent of the parties by their conduct and brings the case within the spirit of the *Markley* decision.

Cohabitation was clearly established.

Catherine Soeder, sister-in-law of the decedent, testified as follows:

"Q. Did you know, of your own personal knowledge, whether Catherine and Ed ever went to Florida together? A. Yes.

"* * *

"Q. Do you know whether Catherine and Ed went to Florida with any other people? Yes or no. A. Yes.

"Q. Who were these other people? A. Well, one year there was Daisy and her husband, Dick Towns.

"Q. How were they related? A. Daisy is Ed's sister.

"Q. Daisy is Ed's sister? A. Yes."

Then, later, Leo Daniel O'Connell testified that the appellee and the decedent stayed together overnight at his home.

"Q. Do you know of your own personal knowledge whether Ed Soeder and your sister occupied the same room in the house at Woodbridge? A. Well, yes.

"Q. Did he have clothing in that house? A. Yes, he had several pieces of clothing.

"Q. What were those pieces of clothing? A. Slacks, some sport shirts, a few sport-type jackets, loafer jackets, shoes, socks, the usual things you would have if you were going to have changes of clothing or such."

Veronica Saley testified the parties stayed together at the appellee's home.

"Q. Now, this might be a little embarrassing to you. Were you ever with them when Ed and Catherine shared the same bedroom? If so, when and where? A. Well, there were a couple of

times when we had card parties, which we stayed late at night. Margaret is a very good card player. I mean at times she plays a couple days at a time and a lot of times when—I am just a beginner, but anyway they were teaching me how to play gin rummy and some poker games which I wasn't too well acquainted with. There were times we would stay way past one, two o'clock at night, and I would stay the night, and Catherine and Ed would stay also. This was on Denison.''

Then on cross-examination, she testified as follows:

''Q. All right. Can you tell us the basis as to how you know that Ed, at any time, ever stayed overnight? Didn't you leave after the card party was over with? A. I think I just told you before that there were times when I had stayed there overnight also, and they also stayed.

''Q. You also stayed overnight? A. Right.

''Q. And was Catherine's mother there at any time when Ed stayed there overnight? A. She lives there. That is right.''

Margaret then testified, by deposition read into evidence, that the appellee and the decedent cohabited in Florida as husband and wife; and that they lived together in an apartment which she rented to them.

''Q. Have you ever had any tenants or did you ever sell to anyone known as Soeder? A. I rented to a Mr. and Mrs. Soeder.

''Q. What were their full names, if you know? A. When I rented it to them, I thought their name was Edward or Ed Soeder and Catherine Soeder.

''Q. Where did they come from, as far as you knew? A. Cleveland, Ohio.

''Q. Who paid the rent, if you remember? A. At times he paid and sometimes she paid.''

Margaret Otten testified as follows:

''Q. Why did you think they were man and wife? What caused you to form the impression they were man and wife? A. Just because they came together to rent an apartment. It was no different than anybody else that came.''

Margaret McCullough testified that she saw Ed Soeder, the decedent, and the appellee at the appellee's home many times, and that the appellee and the decedent stayed at her home overnight on several occasions. She testified as follows:

"A. Well, there was times when I saw him in pajamas and a robe and house slippers, and also my sister was dressed in her robe and pajamas and slippers.

"* * *

"Q. Were there ever occasions that you were present in your sister's home when other persons were present? A. Many times.

"* * *

"A. Especially when we had card games there."

Then, she testified as follows:

"Q. Could you state whether or not Ed Soeder ever stayed at your home overnight?

"* * *

"A. Oh, yes.

"* * *

"Q. How many times a year would he stay at your home overnight? A. Well, like I say, we had card games at my home also, and it was always late when these games finished, and he would stay there."

She testified, further, as follows:

"Q. Did Ed keep any articles of clothing at your home? A. Yes, sir.

"Q. What did he keep there? A. Sleeping apparel.

"Q. Is it still at your home? A. Yes, Sir."

The holding out of the parties to others that they were husband and wife is established through testimony in the record. Joseph Bartoff, the restaurant man, testified that the decedent introduced the appellee as his wife.

"Q. Did he ever introduce you to Mrs. Soeder. A. Yes, very gently."

Catherine Sands testified that she knew the appellee as the wife of the decedent:

"Q. But you have known her as Catherine Soeder? A. Yes."

Again, she testified that the appellee wore a diamond ring:

"Q. What type of ring was it? A. It was an engagement ring.

"Q. Did Catherine ever wear it? A. All the time."

Catherine Sands testified further as follows:

"A. She was known as his wife.

"Q. Now, what friends were ever in your presence? Can you give some names, please? A. Well, there was Mrs. Boba-check, of course, she is deceased, and her family was there, and Ronnie was there."

Again, she testified:

"Q. Now, tell me, in 11 years, any other persons that you might have been in company with with Catherine and Ed that knew them as husband and wife. Think and take your time. A. Well, Mr. and Mrs. Wilcox and there was a Mrs. Bertha Monk, and I am not sure, a Mr. and Mrs. McCormack. Well, I know all of Catherine's family was there, that is for sure. I can't remember all these names."

Madelyn Hakaim testified that the appellee and the decedent were known as husband and wife.

"Q. At the race track, did you meet other people? A. Yes, I did.

"Q. Did other people associate with Ed and Catherine at the race track? A. Yes.

"Q. As far as you know, do you know how those people addressed Catherine and Ed. A. Yes, I do.

"Q. How? A. Mr. and Mrs. Soeder."

On cross-examination, Madelyn Hakaim testified further as follows:

"Q. But just to make sure I understand your testimony, did you actually go up to this redheaded girl and say 'Where is Catherine, Ed's wife?' A. Yes.

"Q. And this redheaded girl is supposed to have said, 'She is ill?' A. She wasn't there that night, she was ill."

Catherine Soeder, sister-in-law of the decedent, testified that the decedent and the appellee were known as husband and wife at the Stadium where they sold refreshments.

"Q. What kind of work did Catherine and Ed do at the Stadium? A. She dispensed cones and cashiered.

"Q. Were they known there, if you know, as husband and wife? A. To my knowledge, I would say yes."

Leo Daniel O'Connell testified that the appellee was known as Mrs. Soeder and that the decedent introduced the appellee as his wife.

"A. And at the various—it is hard to pin this down because he met so many people when we were out. He was in the business, and even the proprietors spoke of my sister as 'Mrs. Soeder' when they would come in."

Then, he testified further:

"Q. Did he ever introduce your sister in any other fashion than Mrs. Soeder? A. He would say 'Catherine, my wife.' "

William J. Jones, an employee at the Federal Reserve Bank, testified that he knew the appellee all his life and that he had known the decedent for fifteen or twenty years and that the decedent introduced the appellee in public at different affairs.

"Q. How did he introduce her? A. Well, he'd introduce her as his wife."

Phillip Comella testified that the appellee and the decedent were introduced to him as Mr. and Mrs. Soeder.

"A. Mr. Soeder didn't introduce her as his wife. I was introduced to them by Ray Strabley as Mr. and Mrs. And neither of them corrected that. So I assumed they were man and wife."

Margaret Otten testified, through her deposition which was read into the record, that the decedent and the appellee held themselves out as husband and wife and were known as such, and as follows:

"Q. Would you tell me what claimant Catherine M. Soeder's exhibit No. 1 for identification is? A. This is a receipt that I had given to Kay Soeder, February 12, 1961, for one week's rent."

Again, she testified how she introduced the decedent and the appellee to others:

"Q. Did you ever introduce Mr. and Mrs. Soeder to anyone? A. I distinctly remember, but I don't remember to whom I did.

"Q. How did you introduce them? A. As Mr. and Mrs. Soeder."

Alice Chance Rosenthal of Phoenix, Arizona, testified at length, by means of deposition read into the record at the time of trial, as to the relationship of the appellee and the decedent.

"A. Well, the first time I met Ed was in Key West. My

husband and I were in Key West, I think it was either February or March, when I met Mr. Soeder. And at the time, a big black car drove up to our door and Sam said: 'Oh, that must be Ed Soeder and his wife because he promised to come down and visit us.' "

Then, she testified further as follows:

"Q. Was Mrs. Soeder introduced to you? A. As Mrs. Soeder, yes.

"Q. And who was Mrs. Soeder? Was that Catherine Soeder? A. Catherine Soeder, yes.

"Q. And just tell us again, what terms were used in your introduction. A. As far as I know—

"Q. Who introduced you? A. Well, if I can—I don't really remember it exactly, but I know. Sam said, 'Oh, that must be Ed Soeder and his wife because he promised to come down to Key West if they got to Florida.'

"And then we went out to the car and then they came into our apartment and were introduced as Mr. and Mrs. Soeder."

Then, she testified:

"A. Well, as far as I know it was in—when we got back to Cleveland, when we were invited out by Ed and—As I say, Mr. and Mrs. Soeder.

"And I think we went to the, I don't know, Green Gables or Greenbriar Restaurant, or some place, for dinner and—with Mr. and Mrs. Soeder.

"Q. And how did Mr. Soeder, or did he, refer to Catherine? In any particular manner? A. Well, as any husband refers to a wife, you know. I don't—as 'Mrs. Soeder,' 'Catherine,' 'my wife.' "

Then, her testimony is as follows:

"A. Oh, yes, especially in 1960. We met quite a few times when we—we were staying at the Continental, I believe, Hotel there. They had a car, we didn't, so they always picked us up wherever we wanted to go.

"So they used to come and pick us up, and we would go out to dinner at—one time we met quite a few friends of Sam's at the Americana. We all had dinner together and we were—Sam introduced them as Mr. and Mrs. Soeder. He never knew anything different.

"Q. Did you hear Mr. Soeder introduce Catherine? A. Oh, yes, often.

"Q. How would he introduce her? A. He would—he would say, 'my wife, Catherine.'"

Then, her testimony reads as follows:

"A. And at that time he said, 'Well,' he said, 'my wife will never have to worry' he said, 'because I have fixed it so she will always have an income, she will never have to work as long as she lives; she will be provided for.'

"Q. And was or was not Catherine present at that time? A. Oh, yes, Catherine was right there when he said it. He said it so casually that—I knew right then and there that he had already provided for her.

"Q. And did you ever have occasion to meet with Ed and Catherine Soeder in their home on Woodbridge Avenue? A. I was there for dinner several times."

Alice Rosenthal testified that the appellee received mail while visiting her lodge as Mrs. Edward Soeder.

"Q. Did she ever receive any mail that you know of? A. Oh, yes. She got mail from her mother, from Ed, her husband.

"Q. How would the envelopes be addressed? A. Well, it would be 'Mrs. Edward Soeder,' and from—I know at one time they were from the milk company, Soeder Company. I don't know just how the milk company was listed. I think it was—because it was Ed's father who owned the milk company before he had.

"Q. And they would be addressed how, and to whom? A. Oh, to 'Mrs. Edward Soeder.'

"Q. And of course would she receive them? A. Oh, sure; sure, she would get them. Sure, we gave her her mail, yes."

The cross-examination of Alice Rosenthal establishes further that during 1960 while in Florida the decedent and the appellee were introduced as husband and wife.

Another witness, John O. Dissinger, testified upon rebuttal that he introduced the appellee and the decedent as husband and wife.

Again, he repeated the same and added, "It was assumed most of the time."

On rebuttal, Margaret McCullough testified as to the reputa-

tion of the appellee and the decedent with regard to their marital status among people who knew them both: "They were always considered man and wife."

Alvin Fridelander, general manager of Berlo Company, testified he believed that the appellee and the decedent were married, as a result of conversation of his employees and he adds, in answer to a question about how Ed referred to the appellee:

"A. I have heard him refer to her as 'my wife.' "

In reviewing the entire record, I can conclude only that a common-law marriage was established by the requisite evidence. To hold otherwise, would be to reverse the unanimous decision in the case of *Sirbello* v. *McDonald* (Case No. 25946, 8th District Court of Appeals), wherein this court found a common-law marriage existed upon facts far less conclusive than those in this case.

In the *Sirbello case*, James Sirbello claimed to be the common-law husband of Jean Thompson. He was a convicted felon, married and divorced three times. Sirbello worked as a bartender in a bar owned by his alleged common-law wife. In that case, not only did the decedent keep all papers and legal documents in her own name, but the decedent's sisters and sister-in-law swore that they had never heard of the purported husband, even though the family was close. Sirbello had gone on only one trip with the decedent—to Buffalo—for two days and had known his alleged wife for only three years.

Where the contract of marriage has been proved by direct, rather than circumstantial, evidence, the nature and extent of the subsequent cohabitation and holding out is not important. What is important is that the parties did cohabit and that they did hold themselves out as husband and wife. This view is supported by the opinion of the Court of Appeals for Franklin County in the case of *Gatterdam* v. *Gatterdam* (1949), 86 Ohio App. 29. An appeal to the Supreme Court was dismissed in 151 Ohio St. 551. In the *Gatterdam case* the Court of Appeals sustained a common-law marriage where the parties lived in a tourist camp for twelve days and held themselves out as husband and wife. In a thorough discussion of the Supreme Court's decision in the *Redman case* and the *Markley case*, the Court

of Appeals found there was a sufficient holding out of the parties to sustain the second paragraph of the syllabus: the common-law marriage, a contract of marriage *in praesenti* having been established by the evidence. Reaching this decision, the court (through Hornbeck, J.) states on pages 38 and 39 that:

"This extended discussion is only indulged in an effort to determine whether both cohabitation and a holding out must be proven in addition to the bare proof of the contract to marry. There is both cohabitation and holding out in the record. Quaere, was the holding out sufficient to meet the requirement of the law?

"The disturbing cases are those of *In re Estate of Redman*, 135 Ohio St. 554, 21 N. E. 2d 659, and *Markley v. Hudson, supra*. The *Redman* authority is a *per curiam* in which language of the opinion is presumed to be the expression of every member of the court. In the *Redman case*, the issue upon which the determination rested was whether there was any proof of a contract of marriage in terms of present tense. The court says that the essential requirements of marriage are stated in the syllabus of *Umbenhower v. Labus, supra* [85 Ohio St. 238], which we have heretofore discussed:

"*Markley v. Hudson* holds that the agreement to marry *in praesenti* may be proven by acts, declarations and conduct of the parties and their recognized status in the community in which they reside. * * *. But it does not determine that the repute of the marital relation in the community in which the parties live must be established *if the requirements as to the contract are met by specific proof, followed by cohabitation as husband and wife.*

"We are convinced, as was the trial judge, that this marriage was, or was not, complete when the parties left the tourist camp. Had the parties gone back to Columbus and held themselves out there as husband and wife, it would have resulted in more evidence of the marriage *but it could not have changed their status.*" (Emphasis added.)

In addition, in the well-reasoned decision of *In re McLaughlin's Estate* (P. C., 1963), 93 Ohio Law Abs. 228, affirmed by the Court of Appeals and motion to certify the record overruled by the Supreme Court, the court held that even when there was

conflicting evidence as to cohabitation and the holding out of the parties as husband and wife, a valid common-law marriage was established.

Further, as stated by Judge Lee E. Skeel of this court, in the case of *Nyhuis* v. *Pierce* (1952), 65 Ohio Law Abs. 73, at page 75:

"If the relationship of husband and wife at common law is once fully established, subsequent doubt thereafter by either party can have no legal effect."

This entire court affirms the finding of the court below that the appellee established by clear and convincing evidence a mutual agreement to marry *in praesenti*. The only point of material disagreement is as to proof of cohabitation and holding out of the parties. In reading this record, as set forth in part herein, I firmly believe that both the cohabitation and the holding out are proved by clear and convincing evidence.

The majority opinion has expressed its view on the sanctity of common-law marriage, and with this I can find no fault. I am not in favor of encouraging common-law marriages, but as long as the law of Ohio permits and recognizes them, we are compelled to follow it.

To hold otherwise than that a common-law marriage was established in this case not only constitutes a reversal of the decision of this court in the *Sirbello case*, but places us in direct conflict with decisions of other Courts of Appeals of this state. See, *Gatterdam* v. *Gatterdam*, 86 Ohio App. 29, and *In re McLaughlin's Estate*, 93 Ohio Law Abs. 228. It would also divert us from the principles espoused in the *Markley case*. It should be kept in mind that all these cases were decided subsequent to the *Redman* decision, which seems to have been relied upon by the majority opinion in reversing the lower court.

I. In conclusion, to paraphrase the Supreme Court in the *Carmichael case*: "each case rests on its own bottom."

In carefully examining the record of testimony and evidence in this case, I reach the inescapable conclusion that all the elements of a common-law marriage are directly proved. Not only was the contract of marriage *in praesenti* proved by direct and unimpeached testimony, but also open cohabitation and a holding out by the parties that they were husband and wife were

clearly established by sufficient uncontradicted testimony. In this regard I disagree with the court below and with my colleagues of this court.

II. With regard to the Probate Court refusing to allow the testimony of Father Casper Heimann, Father Victor Ranly, and Monsignor Kirby, and the unfortunate excusing of Father Butler, I find that, while this might have been error, it was not error of a degree so as to be prejudicial to the estate. Regardless of what testimony and evidence might have been offered, I am of the firm opinion that the record of testimony of nonclergy witnesses, as aforesaid, clearly meets the Ohio requirements to establish a common-law marriage. The testimony of the priest could in no way have prejudiced this testimony.

I must further assume that the court below had valid legal reasons for exclusion of the testimony; with that judgment we should not interfere. See, 58 American Jurisprudence 297, Witnesses, Section 532.

III. With regard to all other exceptions raised and not specifically dealt with above, I concur with the finding and opinion of my colleagues.